THOMAS BLAKE AND BETSY BLAKE V. CORNELIUS CORNWELL
AND CLARK CORNWELL.

*Waters and water-courses—Right of flowage—Equity—Injunction—
Estoppel—Damages.*

Complainants filed a bill to compel defendants to reduce the height
of a mill-dam erected by them in place of one carried away by a
freshet, so that the flowage of complainants' land should not be
increased in quantity above that caused by the use of the old
dam under a right reserved in the deeds through which com-
plainants claim title. The case was heard upon pleadings and
proofs, and a decree rendered denying the *specific* relief sought,
but awarding complainants pecuniary compensation for the dam-
age caused by the increased flowage. On appeal the Court found
the following facts from the testimony:

*a*—That defendants purchased the mill property knowing that
to operate it profitably they would require increased power,
which could only be obtained by raising the head of water in
the pond.

*b*—That they commenced to rebuild and enlarge their mill,
and rebuild and raise the height of the dam, without first
acquiring additional rights of flowage, which rights they pro-
ceeded to acquire from different parties, but made no application
to complainants in that direction.

*c*—That they knew or supposed that by so raising their dam
they would cause increased flowage and injury to complainants'
land.

*d*—That they intended to compensate all persons injured by
such flowage by agreement, if possible, and, if not, by condem-
nation proceedings under chapter 221, C. L. 1871, which they
supposed authorized them so to do.

*e*—The complainants' minor sons, with their consent, labored
for defendants on the new dam, boarding at home; and that com-
plainants had information of the daily progress of the work,
and that defendants intended to raise the new dam higher than
the old one, and that it was liable to increase the overflow of
their lands; but that the extent of such increased flowage was
not known to them.

*f*—That complainant Thomas Blake had one or more inter-
views with one of the defendants, while the dam was in process
of construction, in which he was informed that the dam would
be raised higher than the old one, and probably increase the flow-
age of complainants' land, for which additional flowage defend-
ants agreed to settle; but no agreement or understanding was
arrived at as to the terms of such settlement.

*g*—That after the dam was completed efforts were made to

ascertain and settle the matter between the parties, who were unable to agree, either upon the extent of the increased flowage or the consequent damage.

Upon this state of facts the Court *held:*

1. That the complainants had acquiesced in what was going forward, and were at least silent when they ought to have spoken, if they did not intend to permit any additional flowage of their premises, which they were willing to allow for compensation to be thereafter made; and that the relief asked for is inequitable.

2. That, not being satisfied to stand upon their strict legal rights, nor to assert them in a court of law, this Court will grant that measure of relief which seems equitable under all of the circumstances.

3. That the damage caused by the additional flowage is a continuing one, and entitling complainants to the sum of $1,000, as full compensation for *past* and *future* flowage, not exceeding that alleged in their bill, to be paid, with the costs of both courts, within 30 days after taxation of such costs; and, in default of such payment, an injunction to issue as prayed for.

Appeal from Washtenaw. (Joslin, J.) Argued February 15, 1887. Decided April 14, 1887.

Bill to compel defendants to lower a mill-dam, and to enjoin them from increasing its height, etc. Complainants appeal from a decree awarding them compensation for the damage caused by the increased flowage of their lands. Amount of compensation increased, and decree entered accordingly. The facts are stated in the opinion.

*N. W. Cheever,* for complainants.

*Charles R. Whitman,* for defendants.

CHAMPLIN, J. The bill of complaint in this case states substantially that complainants are joint owners of about 125 acres of farming land, situated on the south side of the Huron river, in the county of Washtenaw, and that most of the land is cleared and under cultivation; that the conveyances under which they hold title contain an exception and reservation as follows:

"Excepting and reserving the right to raise the water, as reserved in a deed from John and Robert Geddes to Jeptha Coburn bearing date July 2, 1838."

That the farm is bounded on the north by the Huron river, and is crossed near said river by the Michigan Central Railroad, and by a public highway; that the buildings are located about 20 rods from the river; that there is next the river a strip of land quite narrow at its west end, but widening out at the east side of their farm, which is rather low, amounting to about seven and one-half acres, and there is also about two acres of such land south of the wagon road; that both of these parcels were well drained, and were good meadow and pasture land, previous to the erection of a new dam by defendants hereinafter stated; that between the railroad and the river is an old gravel-pit, containing about five acres, and there remains about seven acres of land from which gravel could be taken, worth $300 an acre; that there are low marshy lands on both sides of the river, for about one-half mile east of the farm, and the Mallet-creek marsh, of about 40 acres, lies about a half of a mile east of their farm, in all about 100 acres of low land, which was well drained and good meadow or pasture lands before the new dam was built, but since then has been overflowed.

That defendants, about the year 1880, purchased what is known as the "Geddesburg Paper-mill," situated about a mile down stream from complainants' farm, with the dam located about twenty-five rods up stream from the mill, and not more than seven feet high; that by such purchase defendants did not acquire the right to raise or build said dam higher than seven feet above the bed of the river; that soon after such purchase defendants proceeded to build a new dam across the Huron river about five rods above their mill, over twelve feet high from the bed of the river, which they completed in 1881, in the summer, which new dam has set back and raised the water in said river along said farm on an

average of four feet or more higher than it ever was before the erection of said new dam, and more than four feet more than defendants had any lawful right to raise the water in said river, and, as a consequence, the river has overflowed all of said seven and one-half acres north of the railroad, so that the water stands thereon over one foot deep all the time, so that it cannot be used for any purpose, and has soaked into and damaged about four acres more so as to render it unfit for plow land, for which purpose it had been used for about forty years previous to the raising of the dam; that it has flooded and damaged an acre and a quarter more; that such overflow has damaged their gravel-bed so as to make it unsalable; that their land overflowed is worth $100 an acre, and gravel pit or bed $300 an acre.

That said defendants, at the time of building said dam, also built a pulp-mill for the manufacture of paper, to be run by water-power obtained from such dam; that the new dam has raised and set the water back in the pond a mile and a half or more, and increased the size of the mill-pond about 100 acres, which previously was well-drained good meadow and pasture lands, but now covered with decaying vegetation; that the water is raised and lowered at different times, causing these low lands to emit noxious vapors, and malarious poisons and dense fogs are carried over complainants' farm, and sometimes remain all day; that these have caused malarious diseases in complainants' family, and in their neighborhood, and greatly increases such diseases; that these have greatly injured the value of their farm, and impaired the health of complainants and their family, and caused a nuisance, which ought to be abated and removed.

That while defendants were building the dam complainants did not know how high they intended to build the same; that, it being placed lower down the stream, complainants supposed that, if it should be built somewhat higher than the old dam, the water would not be materially raised thereby,

and did not know until it was completed that the water would be raised higher than it had been previous to that time; that since its completion defendants have put flush boards, a foot or more in width, thereon, and say that they intend to put still wider flush-boards on top of the dam, and raise the water still higher; that complainants have requested defendants to remove the flush boards, and to lower the dam, so that the water in said mill-pond would not be raised any higher than it was by the old dam, which defendants have refused to do, but have maintained continuously the dam at the height aforesaid, and have continuously caused the water to set back and overflow complainants' lands, causing the injury and damage as above stated.

Complainants pray for relief by injunction requiring defendants to reduce the height of the dam so that the water in the mill-pond will not stand higher than it was raised by the old dam, and no higher than defendants have a lawful right to raise the water in the mill-pond; and that they be prohibited and enjoined from raising the water higher than they have a legal right to do; and for such further or other relief in the premises as the nature of their case shall require.

The answer fairly puts in issue the material facts stated and charged in the bill of complaint. Defendants admit the purchase of the paper-mill and water-power, and state that, at the time they purchased it, the dam raised the water eight and one-half feet high without the use of flush-boards, with which the water had a fall of nine and a half feet at the mill, and by such purchase they acquired the right to keep and maintain a dam that should raise the water nine feet and six inches at the mill; that the old dam was carried away by a freshet in February, 1881, and they erected a new dam about 25 rods down the stream, and completed the same in August.

After nearly all of the testimony was taken, the defendants obtained leave to and did file an amended answer, in which they say that, at the time they purchased, the old dam

raised the water 10 feet higher at the mill, and they acquired the same right, and that the new dam erected by them is so constructed as to raise the water, and secure a fall not exceeding, nine feet and six inches at the mill; that until the commencement of the suit they supposed and believed that the new dam gave a head of water or a fall at the mill of ten feet and eight inches, and that in the construction of the dam they intended and attempted to effect an increased fall over the old dam, but subsequently, and after taking testimony in this cause, they first learned and now charge the truth to be that accurate measurements show that the said new dam is no higher than they have full and legal right to maintain under their aforesaid purchase of said power. They deny that, during the time of the building of said new dam, complainants did not know how high defendants intended to build the same, and deny complainants did not know until the new dam was completed that the water in the pond would be raised by such new dam higher than it had been previous thereto.

"The defendants, further answering, say that, in the fall of the year 1880, they commenced openly the purchase from the proper parties of an extra right of flowage for their said mill property, which would give them a head of 12 feet at said mill, by the construction of a new dam, and did in some cases effect such purchases; and that in the month of December of the same year they placed on the said mill grounds the greater portion of the materials for said new dam; and that they commenced the building of the same in March of the year 1881, and completed such new dam in the month of August following, and during such months, from March to August, they were engaged continuously, openly, and publicly in the erection of said new dam; and that prior to the commencement of the building of said new dam, and also during the work upon the same, and before its completion, complainants knew and were fully informed by defendants of the height said new dam was to be built, and that defendants intended to build a dam which, with flush-boards, might raise the water 12 feet at the mill, and which would set the water back, and cause an extra flowage on the premises

described in paragraph 1 of said bill of complaint; and they, the complainants, did consent thereto, and agree with defendants that they (defendants) might so construct said new dam that it, with flush-boards, would raise the water 12 feet at the mill; and complainants did then and there agree with defendants that, after said new dam was completed, the water should be drawn down to the level of the old dam temporarily; that the complainants and defendants should examine the ground, and ascertain the amount of the premises, described in paragraph 1 of complainants' said bill of complaint, which had been overflowed or affected by reason of the increased rise of water caused by said new dam; and that complainants would then accept reasonable compensation for the actual injury which complainants had received thereby, which reasonable compensation defendants agreed to pay.

"Defendants, further answering, say that they at all times have been, and are now, ready and willing to pay complainants reasonable compensation for all damages which complainants may have sustained by reason of the construction of said new dam over and above any damage by flowage caused by the old Geddes dam.

"Defendants, further answering, say that the said water-power, when purchased by defendants, was worthless, and that said mill, with such water-power, had proven to be a losing property to every person who had ever owned or operated the same, and that the only way in which said power could be rendered paying or profitable was by the increased head of water subsequently secured by said new dam; that, relying and depending upon such an agreement and understanding with complainants and other persons as aforesaid, defendants have expended upwards of $30,000, over and above the original cost to them of said mill property, in the purchase of such extra power, the erection of said new dam, and the construction of a new pulp-mill on the said premises, all of which would be a total loss to defendants if they should be compelled to reduce the height of their said dam.

"And the defendants, further answering, say that complainants, having acquiesced in the erection of said new dam, and having witnessed the construction of the same without objection or protest, and having been apprised before and at the time of said construction that such new dam would cause an extra flowage on the premises described in paragraph 1 of said bill of complaint, over and above the flowage from the old Geddes dam, and yet remained silent, are now precluded

by their laches from any remedy, except for damage in an action at law."

The cause was heard in the court below upon pleadings and proofs, some taken in open court and some by deposition, and a decree was rendered denying the relief by injunction prayed for, but awarding to complainants pecuniary compensation for the damage and injury caused by overflowing a portion of their lands by maintaining the dam at the height it is constructed, in the sum of $250.

The testimony in the case very clearly establishes the fact that the new dam erected by defendants raises the water to a greater height than the old dam did, and overflows a greater quantity of complainants' land.

It appears, both from the bill and answer, that the right of flowage of complainants' land is evidenced by the deed from John and Robert Geddes to Jeptha Coburn, and what appears strange is that neither party introduced this deed in evidence. Instead of this, they have left the reservation in that deed, which determines the rights of the parties, to the recollection of a witness 82 years of age. John Geddes, one of the grantors in the deed, testifies that the original dam was not more than four and one-half feet high, and so remained a great many years, but at the time he and his brother sold to Conklin & Co., in 1866, they were allowed to hold six feet and eight inches. Whether they had acquired any right to raise the dam to six feet and eight inches, in 1866, does not appear.

Complainants' land was burdened with an easement created in 1838, and defined in the deed from John and Robert Geddes to Coburn. Instead of producing this deed, Mr. Geddes is asked:

"What was the height of that dam at the time you sold it to Jeptha Coburn?"

To which he replied:

"Well, it was about a five-foot dam itself. The dam was way below where we built it."

He also states that when sold, in 1866, the dam was higher than it was when they first built it, and he allowed them to raise it to six feet and eight inches when he sold it.

The counsel for the defendants insists that the issue as presented by the bill, and which defendants have been invited to meet, is the difference between the heights of the old and new dams; that the case was presented by the complainants on the theory that no objection was or could be urged to any flowage which had resulted from the dam which was on the premises when defendants purchased the water-power; so that the fact that the former dam unwarrantably flooded complainants' lands cannot aid them in this case.

Upon the issue, as stated by defendants' counsel, I think the facts are with complainants. The facts are clearly established that the old dam, at any of its varying heights, did not set the water back over complainants' lands to the extent they have been covered since the erection of the new dam. That defendants intended to raise the dam so as to overflow more lands than the former dam, and more than they had the legal right to flow, is apparent and indeed confessed by them. With that intention they had purchased the right to additional flowage, and they insist that their business cannot be profitably carried on without creating a greater head of water, so as to give them increased power, than the old dam afforded.

It is needless to discuss the facts bearing upon this point further. In this conclusion the circuit court was undoubtedly correct. The only point which calls for consideration is whether the complainants have so conducted themselves, by words and actions, as to preclude them from the injunctive relief prayed for.

From the testimony I have reached the following conclusions:

1. That defendants made the purchase of the property knowing that they would require increased power to operate it profitably, and that this could only be done by raising the head of water in the pond.

2. That they commenced to rebuild and enlarge their mill, and to build and raise the height of their dam, without first acquiring any additional rights of flowage.

3. That they proceeded to acquire additional rights from different parties affected, but made no application to complainants.

4. That they knew or supposed that the raising of their new dam to the height designed by them would cause increased flowage and injury to complainants' land.

5. That they intended to compensate all persons injured by such flowage by agreement between them and the parties interested, or, if they could not agree, then by proceedings in invitum to condemn the right, and determine the compensation, supposing that they were authorized to do so by the statutes of this State.[1]

6. That complainants' minor sons, with their consent, labored for defendants upon the new dam; that they boarded at home, and complainants had information of the daily progress of the work, and that defendants intended to raise the dam higher than the old one, and that it was likely to increase the overflow upon complainants' lands, but they did not know the extent to which it might do so.

7. That Mr. Blake, one of the complainants, had one or more interviews with defendant Clark Cornwell, while the dam was in process of construction, in which he was told by defendant that the dam would be raised higher than the old one, and it would probably cause more flowage over his land than the old, and told him he would settle with him for such additional flowage; but no agreement was made or understanding arrived at as to the terms upon which such additional flowage could be had.

8. That after the dam was completed efforts were made to ascertain and settle the matter between the parties, but they were unable to agree, either upon the extent of the additional flowage or the damage occasioned thereby.

The complainants now ask that the height of the dam may be abated, and the dam restored to its former height; and the question presents itself, is this equitable, in view of all

---

[1] Chap. 221, C. L. 1871; held unconstitutional in *Ryerson v. Brown*, 35 Mich. 333.

the circumstances ?    The complainants allowed their sons to be employed and labor upon the new dam after complainants knew that defendants intended to raise the dam, and were engaged in building the dam higher than the old one, and after they expected it would cause an increased flowage. There is no evidence that these minor sons were manumitted. The parent was entitled to, and presumably did, receive their wages.

I can see no difference in the bearing this fact ought to have upon complainant's rights and duty than the fact would have if he had himself been employed upon the dam.  Instead of warning defendants that he would not allow any increased flowage, he permitted his children to continue working upon the dam, and by his conversation with defendant led him to believe that he acquiesced in what was being done in raising the dam to a greater height than formerly.  It is true that what he did and said did not bind the complainants to permit the defendants to overflow their land for nothing, nor operate as a conveyance of the right.    It may have had no influence upon the course of action of defendants, and yet it may have had.  If he had, instead, said to defendant, " I will not permit you to increase the flowage upon our land under any circumstances," defendant might have taken counsel, and ascertained at that stage of the work that the statute upon which he relied for condemnation had been pronounced by this Court unconstitutional and void.

The facts and circumstances are convincing that complainant acquiesced in what was going forward, and that he was at least silent when he ought to have spoken, if he did not intend to permit any additional flowing of their premises. These facts and circumstances show that Blake was willing that it might be done for compensation to be thereafter made, and it appears to me to be inequitable for complainants to say now, after large expenditures of money have been made, that they will not permit their land to be overflowed, to the

extent claimed, for any compensation. They have asked relief from a court of equity. They have not been satisfied to stand upon their strict legal rights, nor to assert them in a court of law. We must grant that measure of relief which seems to us equitable, under all the circumstances.

Much testimony was taken with reference to the injury to the health of complainants and their family caused by increased fogs and noxious vapors. I confess I cannot connect the sickness in complainants' family with the increased flowage. The fact of the additional flowage and submergence of land in the vicinity and of sickness in complainants' family did co-exist; but that the latter was the result of the former is not to my mind satisfactorily established.

The damage caused by the additional flowage is a continuing one, and deprives complainants of the use of valuable land. That it affects, in some degree, the salability of the whole farm is, under the testimony, too plain for discussion, and that it is a damage to the gravel-bed owned by complainants is established. Under all the testimony, I am disposed to award to complainants, as compensation for such additional flowage as is complained of, as full and final compensation for damages for past and future flowage, not exceeding that alleged in the bill, the sum of $1,000, to be paid to them by the defendants, together with costs of both courts, within 30 days after taxation thereof; and, in default of such payment, an injunction shall issue as prayed for in the bill of complaint.

A decree will be entered here in accordance with this opinion, and the record remanded.

The other Justices concurred.