## THE CORNWELL MANUFACTURING COMPANY v. JOHN M. SWIFT ET AL.

*Waters and water-courses—Right of flowage—Prescription—Estoppel—Damages—Pleading—Multifariousness.*

| | |
|---|---|
| 89 | 503 |
| 104 | 33 |
| 89 | 503 |
| 111 | 556 |
| 89 | 503 |
| 148 | ¹542 |
| 89 | 503 |
| 153 | 634 |
| 153 | ¹635 |
| 153 | ¹637 |

1. Occupation and use of a right of flowage or pondage, in order to create a prescriptive right, need not be constant, in the sense of a daily occupancy or use. It must be continuous and uninterrupted, but not necessarily constant. It is necessarily an irregular use, depending upon season and rain-fall; and it is sufficient if the use be the ordinary use, and be resorted to without interruption whenever necessary in the operation of the power.

2. Complainant demurred to the cross-bill for multifariousness, but it is not open to that objection. The original bill was filed to restrain defendants from certain use of the Swift dam. Defendants ask affirmative relief by reason of the construction and maintenance of the Cornwell dam. Defendants were all necessary parties to the original bill; and for the purposes of the relief by injunction prayed for in the cross-bill, and granted,

were necessary parties to that also. Thus far there is a community of interest. Defendants' interests are not separate and distinct, nor are they equal, but they are joint.

3. Defendants had acquired, by grant and prescription, certain pondage rights, the right to flow certain lands, the right to maintain a mill-pond, and, as incident thereto, a right to the uninterrupted flow of the water so ponded to their mills. The mill-pond is as necessarily a part of the plant as the dam itself. Complainant has not availed itself of a common use of a stream, but has appropriated vested rights of pondage. This is in no sense a use of that which was common to all, but it is an appropriation of a right which had attached and had become exclusive within its limits.

4. The use which an abutting owner may make of a mill-pond to which another has acquired the right for pondage purposes must be consistent with the exercise of the pondage right. The grant of a right to flow the banks of a stream for pondage purposes is inconsistent with the right to dam the waters of the stream so as to prevent the very flowage the right to which was granted.

.5. The evidence in this case clearly showed that defendants had acquired the right to use flash-board to the height of four feet and six inches, but the court in its decree, in view of the fact that complainant had been allowed by the defendants to expend some $40,000 in the construction of its dam and mill, limited such use to four feet, and under the authority of *Blake v. Cornwell*, 65 Mich. 467, and *Miller v. Cornwell*, 71 Id. 270, awarded to defendants compensation in damages for accrued and future injuries by reason of such restriction; which decree is affirmed, with costs.

Appeal from Washtenaw. (Kinne, J.) Argued October 8, 1891. Decided December 23, 1891.

Bill to restrain the defendants from raising the flushing structure on their mill-dam above a certain height. Complainant appeals. Decree affirmed. The facts are stated in the opinion.

*Charles R. Whitman,* for complainant, contended:

1. The test as to whether a deed is void on account of defective description is this: Can the land described be located and its boundary lines established? or, in other words, can the land be

surveyed as described? citing *Ryerson v. Eldred*, 18 Mich. 12; *Williams v. Railway Co.*, 50 Wis. 71, 77. If this deed did not convey to the grantees the land described, it did not convey something less than the fee,—an easement, a right of flowage; and it follows, therefore, that under this deed the defendants have acquired neither the title to land nor a right of flowage.

2. It is needless to cite authorities that title by prescription can only be sustained by a continuous, uninterrupted, and adverse holding. The evidence should be directed, not to what height the flash-boards have been from time to time carried, but to what height the water in the mill-pond has been customarily and habitually maintained; citing *Turner v. Hart*, 71 Mich. 128, 137, 138.

3. The defendants have in their answer claimed the benefit of a cross-bill, and seek for equitable relief. On demurrer, all the tests which are applicable to a cross-bill may be applied to this answer to determine whether defendants are entitled to affirmative equitable relief; citing *Hackley v. Mack*, 60 Mich. 591.

4. The general rule in equity is that several grievances must be redressed by several proceedings. If there is any distinction in the proportion or character of the several grievances, there can be no joinder; citing *Winslow v. Jenness*, 64 Mich. 84; and there is no authority under which defendants may join to recover individual damages from complainant; citing *Kerr v. Lansing*, 17 Mich. 34; *Scofield v. Lansing*, Id. 437; *Middleton v. Booming Co.*, 27 Id. 533.

5. The cross-bill seeks, in addition to injunctive relief, an accounting for alleged loss of profits and the award of damages, which present a multiplicity of issues. Objection was duly taken by demurrer. Even if that were properly overruled, surely when the only issue left upon the cross-bill was an accounting between complainant and the several defendants, the court should of its own motion have dismissed the cross-bill; citing *Scofield v. Lansing*, 17 Mich. 437.

6. Since defendant Storms is not entitled to relief, there is a mis-joinder of complainants in this cross-bill, which is fatal, and the cross-bill must be dismissed as to all the defendants; citing 1 Danl. Ch. Pr. (5th ed.) *302, note 5; *Fulham v. McCarthy*, 1 H. L. Cas. 703.

7. The common-law rights of a riparian owner in a running stream in its natural condition are well established. He has, as appurtenant to his estate, an easement in the stream above and below his premises. He has the right to have the stream flow upon his land in its natural channel, undiminished in quantity, and not changed in quality, and to flow from his land

freely and without obstruction; citing *Dumont v. Kellogg*, 29 Mich. 423; *Pugh v. Wheeler*, 2 Dev. & Bat. 50.

8. An easement consisting of the right to use water for domestic or mill purposes, unless modified by the express terms of a grant, is enjoyed subject to the right of the owner of the servient estate to use the same water for like purposes, and this is true, whether the easement was originally appurtenant to the land or has been acquired by grant or prescription; citing *Roberts v. Richards*, 50 L. J. Ch. 297; *Holker v. Porritt*, 42 L. J. Exch. 85, 44 Id. 52; *Nuttall v. Bracewell*, 36 Id. 1; and this same rule has been applied over and over again to the use of water in a flowing stream; citing *Cary v. Daniels*, 8 Metc. 466, 476; *Gould v. Boston Duck Co.*, 13 Gray, 442.

9. Where the flow of a natural stream has been increased by artificial means, the water thus added to the stream becomes an inseparable part of the water originally in the stream; it cannot be diverted. A riparian owner is entitled to the flow of all the water in the stream after the quantity has been thus artificially increased; citing *Druley v. Adam*, 102 Ill. 177, 193; and it follows that, when the quantity of water has been increased in a water-course by a dam, the owner of such dam has the same and no greater right in the water thus increased in quantity than he had in the water in its natural condition; citing *Wood v. Edes*, 2 Allen, 578; *Bearse v. Perry*, 117 Mass. 211.

*J. F. Lawrence* and *Sawyer & Knowlton*, for defendants, contended:

1. This Court and others have said, time and again, that instrumental levelings must yield to actual facts; citing *Brown v. Bush*, 45 Penn. St. 61; *Turner v. Hart*, 71 Mich. 135; *Mill Co. v. Greer*, 58 Iowa, 86.

2. The defendants in this case might, with great confidence, rely upon the uninterrupted exercise of the right of flowing the Huron river for a long distance above the first Michigan Central Railroad bridge for a period of over 50 years. They have thereby acquired the right to flow the lands so used by prescription. Priority of appropriation of the waters of a stream gives to one proprietor no superior right to that of others, unless it has been continued such a length of time, and under such circumstances, as would be requisite to establish rights by prescription; citing *Dumont v. Kellogg*, 29 Mich. 422.

3. The use of an easement for 20 years, if unexplained, will be presumed to be under a claim of right, and adverse, and sufficient to establish a title by prescription. It is incumbent

on the owner of the servient tenement to show that the use was under some license or contract inconsistent with a claim of right, in order to defeat the right which long use will give; citing Gould, Waters, § 341; *White v. Chapin*, 12 Allen, 516; *White v. Loring*, 24 Pick. 319; *Hammond v. Zehner*, 21 N. Y. 118; *Miller v. Garlock*, 8 Barb. 153; *Hart v. Vose*, 19 Wend. 365; *Perrin v. Garfield*, 37 Vt. 310; *Garrett v. Jackson*, 20 Penn. St. 331; and when, as in this case, the owners of the dominant and servient estates claim under a common grantor, the force of the presumption is not diminished; citing *White v. Chapin*, 12 Allen, 520.

4. The maintenance of a dam and mill-pond is an act of sufficient notoriety to raise a presumption of knowledge on the part of the land-owner. It is a circumstance of such notoriety that the person against whom the right is exercised has reasonable notice that the right is claimed against him; citing Gould, Waters, § 337; *Perrin v. Garfield*, 37 Vt. 311.

5. Flash-boards were used on the dam of the defendants so constantly as to become a part of it; citing Gould, Waters, § 337; *Pierce v. Travers*, 97 Mass. 306; *Marcly v. Shults*, 29 N. Y. 346; *Hall v. Augsbury*, 46 Id. 622; *Carlisle v. Cooper*, 21 N. J. Eq. 596; *Ogle v. Dill*, 55 Ind. 130.

6. The complainant claims that one of the defendants, John M. Swift, stood by and saw the complainant expend large sums of money in erecting its dam and mill, and by his silence led the complainant to suppose that it was building this dam and mill upon its own grounds, and that, therefore, the defendants are now estopped from questioning its title. All the following elements must be present in order to constitute an estoppel by conduct:

*a*—There must have been a false representation, or a concealment of material facts.

*b*—The representation must have been made, or the concealment practiced, with the intention that it should be acted upon.

*c*—The party claiming the estoppel must have been ignorant of the facts.

*d*—The representation must have been made, or the concealment practiced, with knowledge of the facts.

*e*—The party claiming the estoppel must have relied upon the representations, and been induced to act thereon; citing Bigelow, Estop. 480.

7. The principles which estop a man from claiming his own property are highly penal, and should not be enforced unless there is a concurrence of circumstances necessary to the creation of

an estoppel; citing 2 Herm. Estop. § 960; nor does it apply to one who has no knowledge of his own right, the rule being that the estopped party must have had knowledge of his rights; citing 2 Herm. Estop. § 960; *Lewis v. San Antonio*, 7 Tex. 288; *Hill v. Epley*, 31 Penn. St. 331, 334; *Burke v. Adams*, 80 Mo. 504; *Whitaker v. Williams*, 20 Conn. 98, 103.

8. In order that the principles of estoppel may be invoked by the complainant, it is imperative that it should show that it was ignorant of the rights of the defendants; citing *Steel v. Smelting Co.*, 106 U. S. 447; 2 Herm. Estop. §§ 949, 969.

9. At the time the complainant was building its dam and mill, it had notice that the defendants were backing up the water every day. It asked the book-keeper of the defendants, Mr. Bourns, to draw off the water, in order that it might go on with its work. This was notice, and should have put the complainant on inquiry, which would have disclosed the right of all parties; citing Wade, Notice, §§ 273, 300; *Hendricks v. Kelly*, 64 Ala. 388; *Russell v. Sweezey*, 22 Mich. 235; and the constant flowing of the land was sufficient to put the complainant upon inquiry. It was possession; citing *Bryant v. Booze*, 55 Ga. 438; Wade, Notice, § 65, and note.

10. The requests made by Henry Stoup, the superintendent of the complainant, and Henry Cornwell, president, to Swift and Bourns to take off the flash-boards, and Cornwell's offer to pay for the work, were not only a confession of the knowledge, but an admission, that the defendants had the right to flow; citing *Weed v. Keenan*, 60 Vt. 74 (13 Atl. Rep. 804); *Schaidt v. Blaul*, 66 Md. 141 (6 Atl. Rep. 669).

11. The Bird and Markham deeds given to the defendants' grantors were of record in the register of deed's office, and were equally open to the inspection of both parties. The rule is that, when the source of information is equally open to both parties, there is no estoppel; citing *Schaidt v. Blaul*, 66 Md. 141, 148; *Foster v. Albert*, 42 Ind. 40; *Hill v. Epley*, 31 Penn. St. 331; *Bales v. Perry*, 51 Mo. 449, 452; *Spurlock v. Sproule*, 72 Id. 503; *Healey v. Worth*, 35 Mich. 166; 2 Herm. Estop. §§ 948, 957, 969; *Ripton v. McQuivey*, 61 Vt. 76 (17 Atl. Rep. 44).

12. When it is claimed that silence makes an estoppel, and that estoppel affects title to land, the record of the title furnishes a means by which the other party may ascertain the truth, so that he cannot claim to be misled, and no estoppel applies; citing *Casey v. Inloes*, 1 Gill, 501; *Brinckerhoff v. Lansing*, 4 Johns. Ch. 65; 2 Pom. Eq. Jur. § 810; *Carter v. Champion*, 8 Conn. 549, 554; *Carr v. Wallace*, 7 Watts, 401; *Crest v. Jack*, 3 Id. 240; *Alexander v. Kerr*, 2 Rawle, 93; and the

fact, if it existed, that Swift drew down the water at Cornwell's request, in order that Cornwell could put plank on the apron of complainant's dam, was no acquiescence; citing *Bealey v. Shaw*, 6 East, 208; *Allen v. McKeen*, 1 Sumner, 276; 2 Herm. Estop. § 937.

13. The silence of Swift must have induced the purchase; citing 2 Herm. Estop. § 944; and there is not a word of evidence in the case to show that anything Swift did or said or omitted influenced complainant's conduct, and therefore there is no estoppel, even of Swift; citing *Malloney v. Horan*, 49 N. Y. 111.

14. John M. Swift, Mary E. Loomis, Lucy S. Bourns, and John Finnegan, surviving assignee of the Ann Arbor Agricultural Company, are tenants in common of the race, the dam, the mill-pond, and the land underneath, the right of flowing, and the land conveyed by the Bird and Beckley deed used in connection with the defendants' property. There is no evidence in the case that John M. Swift's sisters, Mary E. Loomis and Lucy S. Bourns, even knew or heard that the complainant was building a dam until long after its completion. There is no evidence that they knew or heard anything about its location until the answer was filed in this cause. The record is entirely silent upon this subject. There is no evidence that John Finnegan, the surviving assignee, knew or heard anything about the building of Cornwell's dam while it was being built, or that he knew or heard anything about its location until long after it was finished. Under such circumstances there can be no possible claim of estoppel. No matter what John M. Swift may have said or done, it cannot bind the other tenants in common, who had no knowledge of his sayings or acts.

15. John M. Swift could not by deed have conveyed that land taken by the Cornwells, and the right of flowing by them appropriated, without the knowledge and consent of his cotenants. It is well settled as a rule of law that the conveyance of a separate estate by a tenant in common by metes and bounds is void as regards the co-tenants; citing *Adam v. Briggs Iron Co.*, 7 Cush. 368; nor can a tenant in common of property, who owns other premises in severalty, so use the last as to acquire or exercise for the benefit of his premises owned in severalty an easement in property held in common; citing *Great Falls Co. v. Worster*, 15 N. H. 412.

16. Deeds and other conveyances made by a tenant in common of his interest by metes and bounds are not merely inoperative, but are void, and may be so treated by the other tenants in common; citing *Marshall v. Trumbull*, 28 Conn. 185.

17. An estoppel against one tenant in common cannot bind the other tenants in common, and is without force or efficacy; citing *Crippen v. Morss*, 49 N. Y. 63.

18. The acts of the parties under a deed in taking and retaining possession give a practical construction to. the deed, and estop all parties from denying that the land taken under the deed was not the land conveyed; citing *Lyles v. Lescher*, 108 Ind. 382 (9 N. E. Rep. 365).

19. The acts of the parties under a defective conveyance, with the practical construction given it by occupation on the one part and consent or acquiescence on the other, are legal evidence of their intention, having weight and effect upon the construction to be given to the conveyance; citing *Kingsland v. New York*, 45 Hun, 198.

20. Where the acts of the parties have placed a construction upon a contract, the court will give effect to the contract as the parties have construed it; citing *Johnson v. Gibson*, 78 Ind. 282; *Reissner v. Oxley*, 80 Id. 580.

McGRATH, J.  This controversy arises between mill-owners on. the Huron river near Ann Arbor, and involves flowage and pondage rights.

The course of the section of the stream upon which these mills are located, commencing in the N. W. ¼ of section 17, in the township of Ann Arbor, is southerly, into the S. W. ¼ of 17; thence easterly, through the S. ½ of 17; thence south-easterly, crossing the N. E. corner of 20, into 21; thence making a sharp bend, and running south-westerly across the S. E. corner of the N. E. ¼ of 20; thence southerly, and then easterly, through the S. E. ¼ of 20, into the S. W. ¼ of the S. W. ¼ of 21. After the river leaves the W. ½ of the S. E. ¼ of 17, it is for the most part lined on either side with prominent banks, and the bed of the river is not to exceed 500 feet wide at its widest point, but where it leaves the S. W. ¼ of 17 it is 1,000 feet in width, and in the S. E. ¼ of the S. W. ¼ of 17 it is over 1,200 feet in width, forming a basin over. 2,000 feet long.  Defendants' mills are located in the S. W. ¼ of the S. W. ¼ of 21.  Their dam

is near the center of the S. E. ¼ of 20. Complainant's mill and dam are located in the S. ½ of the S. W. ¼ of the S. E. ¼ of 17, at the point where the river narrows at the mouth of the river basin above referred to.

The theory of complainant's bill is that defendants have no right to raise or maintain the flushing structure on the apron of their dam higher than two feet and three inches above the level of said apron. The sixth paragraph of the bill of complaint is as follows: · ·

"That in the summer of A. D. 1885, while your orators were engaged in the construction of sa'd dam of the Cornwell Manufacturing Company, these defendants wrongfully and unlawfully placed additional planking on the said flushing structure of said defendants' said dam, and thereby raised the water upwards of a foot back upon the said dam of said Cornwell Manufacturing Company higher than they (these defendants) had any lawful right to do; and that again, in the spring of A. D. 1886, notwithstanding the protests of your orators, these defendants placed yet more planking on their said flushing structure, so that the water in their mill-pond was raised from one foot to one foot and ten inches higher than the same had ever been raised prior to the preceding summer, and higher than these defendants had any lawful right to do; and that, in consequence, defendants raised the banks of their said mill-race to prevent the water from overflowing the same; and that, by reason of said increased height of said flushing structure, said defendants continuously from the spring of 1886 till early in the month of February, 1887, and without any lawful right so to do, have set back and raised the water in said river upon the apron of the dam of said Cornwell Manufacturing Company, and upon the draft-tubes and water-wheels in the said mill, as well as upon the lands and mill property of said Cornwell Manufacturing Company, from one foot to one foot and ten inches higher than said defendants have any lawful right to raise the water in said river; and that these defendants thereby, wrongfully and unlawfully, have diminished the head of water at said mill of said Cornwell Manufacturing Company to the aforesaid extent of from one foot to one foot and ten inches."

Defendants' answer is in the nature of a cross-bill, and alleges that the construction of complainant's mill and dam was in violation of rights of flowage and pondage acquired by defendants, not only by grant, but by prescription; that defendants' dam and mills were erected between the years 1830 and 1835, and complainant's in 1885; that complainant's dam is erected within defendants' mill-pond, and that the operation of complainant's mill interferes with the operation of defendants' mills, by seriously interfering with the water flowage; and they ask that complainant be perpetually restrained from operating its mill or using its dam.

A demurrer was interposed to defendants' cross-bill, which was overruled.

The court below dismissed complainant's bill, with costs to defendants; awarded to defendants Swift, Loomis, and Bourns the sum of $15,500, and to John Finnegan the sum of $5,000; and, in default of the payment of these sums, ordered that a mandatory injunction issue, commanding the removal and abatement of complainant's dam; and decreed—

"That the defendants shall at no time maintain the flash-boards upon their flushing structure higher than is necessary and adequate for the proper and reasonable use of their several and respective mill privileges as now constituted and established; that the said defendants, in low stages of water, and whenever necessary for the proper and reasonable use and reasonable running and carrying on their several mills and shops, shall have the right to raise the flash-boards upon said flushing structure upon said dam of said defendants to the height of four feet above the apron structure of their said dam; and they shall at all times so manipulate their mill-pond as to cause the least possible inconvenience to the wheels of the complainant's mill in the way of backwater, consistent with their own necessities; that the complainant shall have the right to maintain its dam as at present erected and used, and to enjoy and propel its machinery as established and used since February, A. D. 1886,

except as herein otherwise provided; and that the said complainant shall manage and manipulate its said mill-pond in a fair and reasonable manner, consistent with the rules, needs, and customs of mill-owners, with a view to giving the defendants as uniform and steady a supply of water as possible, consistent with its own necessities and the rights of the defendants; and that the said complainant shall not unreasonably or unnecessarily detain the water in its said mill-pond, nor discharge the same in unnecessarily or unreasonably large quantities, but its interruption and discharge of the water shall be such as is necessary and unavoidable, and requisite to the proper use and enjoyment of its mill privileges."

The complainant appeals.

The points presented to the Court are:

"*First.* Should the defendants be permitted to maintain a flushing structure to the height of four feet above the level of the apron to their dam? and if to a less height, to what height?

"*Second.* As to the cross-bill of the defendants,—

"*a*—Shall the demurrer of complainant be sustained?

"*b*—If the demurrer is not sustained, should any damages be awarded to these defendants? and if yes, should the amounts be less than the sums awarded below?

"*Third.* Should costs be awarded to complainant?"

Defendants claim to have obtained the right to maintain flash-boards to the height of four and one-half feet by grant. On July 7, 1835, Seth Markham conveyed to defendants' grantors—

"The full, exclusive, and uninterrupted right and privilege of overflowing, reflowing, and keeping overflowed with water such part and so much of the land owned by him (the said Seth Markham), on sections seventeen and twenty, in township two south, of range six east, in said territory, as they may or can at any time overflow, without raising the water so high that it would stand within five and one-half inches of the upper shoulder of the upper post in the bridge over the race or mill canal on the east side of the river, where Broadway, in Brown & Fuller's addition to the village of Ann Arbor, crosses the same."

89 MICH.—33.

On June 11, 1835, Joseph Beckley and John B. Bird conveyed to defendants' grantors—

" All that part of the west part of the south-west fractional quarter of section seventeen, in the township of Ann Arbor, which is now overflowed with water, by reason of Brown & Fuller's mill-dam, erected near the village of Ann Arbor, or which may be overflowed by said dam with flash-boards and other improvements, or by any other dam which may be erected on said river with improvements; together with all and singular the hereditaments and appurtenances thereunto belonging."

These conveyances were recorded at the time.

Complainant derives title to the west part of the south-west fractional quarter of section 17 through John B. Bird, who is the same common grantor through whom defendants claim title. John B. Bird, on June 26, 1840, conveyed the land last described to John Allen, but made no exception or reservation of the land which he had previously conveyed to Brown and Fuller, defendants' grantors. It is through this conveyance from Bird to Allen that complainant claims title to the west part of the south-west fractional quarter.

It is, however, objected that the descriptions in the conveyances to defendants' grantors are indefinite, and that there is no testimony here by means of which the exact boundaries of either grant may be determined. There can be no serious claim but that the testimony clearly shows that the backwater from defendants' dam frequently, for a period of at least 40 years, reached far above complainant's dam, and is now only prevented from so doing by the presence of the latter obstruction. Nor can there be any doubt but that complainant had knowledge of that fact. Stoup, the millwright who had charge of the construction of the dam for complainant, when asked if he knew how far up the river the Swift

dam used to set the water before the Cornwell dam was built, replied that, when the water was high in the river, he had seen it back up 50 or 60 rods above the Cornwell mill. This same witness also testified that, before he fixed the height of the apron piles, he went down to defendants' mill, and inquired of one of the employés at the mill to what height they raised the water; that the height was given to the witness, and the height of the apron piles was fixed accordingly, but after this, and before the piles were sawed off to the height fixed, the water was raised by defendants so that he could not saw off the piles, and the scaffolding which had been erected was floated off; that he requested defendant Swift to draw off the water; that the water afterwards lowered, and the piles were finally sawed off on Sunday, when the Swift mill was shut down. Complainant made no inquiry as to why the water was raised; it made no protest against it; but in spite of the fact that, in the course of what must have been deemed to have been the legitimate operation of the defendants' mill, the water drove complainant from its work, it persisted in the construction of the dam, knowing that it would interfere with the operation of defendants' mill, and knowing that the very same water backing that interferred with the conduct of its work would interfere with the operation of its own mill. Nearly all the witnesses, including those called for complainant, testified that that the water frequently backed up far above complainant's dam. They differed only as to the distance above the dam, some placing it as low as 60 rods, others fixing it at 200 rods. Defendants' witnesses, men who had been engaged about defendants' mill in putting on and taking off the flash-boards for many years, testified that the backwater extended up 3,300 feet above the Cornwell dam, and that it took from

three and one-half to four boards, a foot wide, to back the water that distance.

The old bridge mentioned in the Markham deed was removed in 1867. At the time of the trial there was nothing in existence by which it could be determined how high the water in Swift's pond would rise, or how far back it would flow, if it came "within five and one-half inches of the upper shoulder of the upper post in the bridge," etc. The second railroad bridge is located about 5,000 feet above the Cornwell dam. The defendants produced upon the trial one Solomon Armstrong, who was an eye-witness of a certain experiment made on an early day to fix and determine the extent of the right of flowing conveyed by the Markham deed. It appears that, in 1841, William M. Sinclair, who was the owner at that time of the grist-mill in Ann Arbor, and Dwight Kellogg, who owned the upper mill, located just above where the second Michigan Central Railroad bridge now is, met together for the purpose of determining how far up the river the backwater from Sinclair's mill-pond should extend. Sinclair chose a man to represent him by the name of Waite, and Kellogg chose one Torrey. Armstrong took Waite up the river in a boat to the place of meeting. Kellogg, Torrey, Waite, and Armstrong got together about 20 or 25 rods below where is now the second Michigan Central Railroad bridge, and then and there determined the right of the respective mill-owners as to the extent of the backwater. Armstrong drove a stake, and a mark was made on a tree and a stone, which fixed the height to which Sinclair had a right to raise the water in his mill-pond. This could only have been determined by raising the water in the race at Sinclair's mill to "within five and one-half inches of the upper shoulder of the upper post in

the bridge" over Broadway, and then going up the
river and fixing the limit of the backwater. This experi-
ment, beyond all question, determined that under the
Markham deed the defendants had a right to back the
water in the Huron river to within 20 or 25 rods of the
second Michigan Central Railroad bridge.

In 1849, while the witness Solomon Armstrong was
working in Kellogg's mill, William M. Sinclair, the
owner of the Swift mill, and Edward L. Fuller, who
owned the paper-mill, came to the upper mill for the
purpose of seeing how high the new dam, that had just
been constructed, backed the water. Torrey, Kellogg,
and Armstrong went down to the place where the mark
had been made in 1841, and there met Fuller and Sin-
clair. The water was found to be six inches below the
marks made in 1841. At that time there were four
flash-boards, one foot wide, on Sinclair's dam. Six inches
more were put on, which raised the water up to the
marks made in 1841.

The test of the extent of the backwater showed
beyond question that under the Markham deed the
defendants had the right to use on their dam flash-boards
four and one-half feet high, and the right to back the
water 4,500 feet above the dam of complainant. One of
these deeds to defendants' grantors expressly relates to
overflow from the very dam now operated by defendants,
and the other also refers to overflow from the same cause,
although it contains, in addition, a broader grant.

It is a most significant fact that at the very inception
of this enterprise, to which defendants have succeeded,
and 50 years before the construction of complainant's
dam, the very parties connected with that enterprise
deemed the right to use certain of the abutting lands on
section 17, and as far over as the W. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$
of that section, for pondage, and the control of this basin

upon that section, necessary to their protection and the use and operation of this very dam. One of the Cornwells testified that with 2 feet and 6 inches of flashboards the water would back up the river 100 rods above the first railroad bridge, which would be about 70 rods above the Cornwell dam; but that would still be nearly 800 feet below or east of the east line of the W. ½ of the S. W. ¼ of 17. Defendants have been excluded from the entire S. W. ¼ of 17, as well as the entire W. ½ of the W. ½ of the S. E. ¼ of section 17. Over 2,000 feet of the west bank of the river is within the W. ½ of the S. W. ¼ of 17; and the Beckley and Bird deed expressly recognizes a then present use, and contemplates a continuance of that use and occupancy; and the east line of the W. ½ of the S. W. ¼ of 17 is over 2,000 feet above and west of the Cornwell dam. A construction which gives to this deed any effect, force, or vitality whatever, defeats the complainant's claim; for that claim would practically exclude defendants from any part of the description in that deed. It is only necessary to give to these instruments that construction which the parties in interest have given to them by use and occupation on the part of the grantees, and by acquiescence on the part of the grantors. The deeds recognize the then present use, and the testimony shows the uninterrupted enjoyment of that use for half a century. It was shown that as early as 1841 the defendants' grantors had used and maintained a flushing structure above the apron of their dam to a height of four feet and six inches. The only testimony offered by complainant to the contrary was the opinions of experts, based, not upon any practical tests, but upon instrumental levelings; but "actual tests by observation and experience afford the most satisfactory testimony upon which to rely in determining the results," and are controlling when brought in conflict

with instrumental measurements, however accurately and carefully taken. *Turner v. Hart*, 71 Mich. 128.

Defendants have, however, rights of pondage upon the portions of section 17 from which they have been excluded, not only by grant, but by prescription as well. Occupation and a use of a right of flowage or pondage, in order to create a prescriptive right, need not be constant, in the sense of a daily occupancy or use. It must be continuous and uninterrupted, but not necessarily constant. It is necessarily an irregular use, depending upon season and rain-fall; and it is sufficient if the use be the ordinary use, and be resorted to without interruption whenever necessary in the operation of the power. There can be no doubt but that the use of flash-boards to the height of four feet and six inches before the construction of the Cornwell dam was but occasional, and that since the construction of the Cornwell dam the use of flash boards to that height has been more frequent and continuous, and therefore more noticeable; but this is a result which would naturally follow from complainant's act. The same volume of water and force and regularity of flowage enjoyed before the reduction of the area of defendants' mill-pond cannot now be obtained, except by additional flash-boards. The same volume of water in a mill-pond reduced in size can only be obtained by raising the obstruction at the point of exit.

Complainant demurred to the cross-bill for multifariousness, but it is not open to that objection. The original bill was filed to restrain defendants from certain use of the Swift dam. Defendants ask affirmative relief by reason of the construction and maintenance of the Cornwell dam. Defendants were all necessary parties to the original bill; and for the purposes of the relief by injunction prayed for in the cross-bill, and granted, were necessary parties to that also. Thus far there is a com-

munity of interest. Defendants' interests are not sepa-
rate and distinct, nor are they equal, but are joint. In
*Ingersoll v. Kirby*, Walk. Ch. 65, 69, Chancellor MAN-
NING says:

"A complainant cannot demand several distinct things,
having no connection with each other, of several defend-
ants, by the same bill. But when the matter in litigation
is entire in itself, and does not consist of separate things
having no connection with one another, it is not neces-
sary that each defendant should have an interest in the
suit coextensive with the claim set up by the bill. He
may have an interest in a part of the matter in litigation,
instead of the whole."

All the parties are interested in the relief granted by
injunction, and it is by reason of their common right to
this relief that the bill lies. The damages awarded in
chancery are subsidiary, and the court has an undoubted
right to apportion those damages between the parties in
proportion to their respective interests. In the present
case, however, the court granted an injunction, but
awarded compensation in damages, instead of an injunc-
tion a broad as prayed for.

It is undoubtedly true, as contended by complainant's
counsel, that a mere right to raise the water to a given
height does not vest any right in the land flowed, or in
the water itself, but a mere right to raise the water to
a certain head and overflow the land (*Bigelow v. Shaw,*
65 Mich. 341), and that riparian proprietors have an
equal right to the use of the water, and the right of
each qualifies that of all the others; and the question
always is, not merely whether the lower proprietor suffers
damage by the use of the water above him, nor whether
the quantity flowing on is diminished by the use, but
whether, under all the circumstances of the case, the use
of the water by one is reasonable and consistent with a
corresponding enjoyment of right by the other (*Dumont*

*v. Kellogg*, 29 Mich. 420). But the rules laid down in these cases have no application to the facts of the present case. In *Bigelow v. Shaw*, the sole question was whether the riparian proprietor had the right to harvest ice on the flowed land; and in *Dumont v. Kellogg* no question of prescription was involved; indeed, the Court lay it down as the settled doctrine—

"That priority of appropriation gives to one proprietor no superior right to that of the others, *unless it has been continued for a period of time, and under such circumstances, as would be requisite to establish rights by prescription.*"

In the present case defendants had acquired, by both grant and prescription, certain pondage rights, the right to flow certain lands, the right to maintain a mill-pond, and, as incident thereto, a right to the uninterrupted flow of the water so ponded to their mills. The mill-pond is as necessarily a part of the plant as the dam itself. Complainant has not availed itself of a common use of a stream, but has appropriated vested rights of pondage. This is in no sense a use of that which was common to all, but it is an appropriation of a right which had attached and had become exclusive within its limits. The use which an abutting owner may make of a mill-pond to which another has acquired the right for pondage purposes must be consistent with the exercise of the pondage right. The grant of a right to flow the banks of a stream for pondage purposes is inconsistent with the right to dam the waters of the stream so as to prevent the very flowage the right to which was granted.

Complainant's counsel do not discuss the question of the amount of the damages awarded, except to say that it appears by defendants' showing that there is a mortgage upon the flouring-mill in excess of the value of the property, and complainant may be compelled to pay

damages to the mortgagees. The existence of the mortgage appears only incidentally in the record. It does not even appear that the lien of the mortgagees extends to this pondage right; but, be that as it may, the record discloses an understanding between the mortgagors and mortgagees as to the distribution of the proceeds of the decree, and in view of that arrangement complainant is fully protected.

The only other question is as to the awarding of costs to defendants. The court below, solely in view of the fact that complainant had been allowed by defendants to expend some $40,000 in the construction of its dam and mill, placed a restriction upon defendants' rights. The evidence clearly showed that defendants had acquired the right to use flash-boards to the height of four feet and six inches; but the court, in its decree, limited defendants to the use of four feet of flash-boards, and under *Blake v. Cornwell,* 65 Mich. 467, and *Miller v. Cornwell,* 71 Id. 270, awarded to defendants compensation in damages for injuries which had accrued, and for future injury, by reason of the restriction. The complainant utterly failed to make out the case set up in its bill; but the court, in its discretion, has undertaken to preserve its mill and dam by placing a restriction upon defendants, which complainant may avail itself of by the payment of the damages awarded.

The decree of the court below is affirmed, with costs, and the record remanded.

Long and Grant, JJ., concurred with McGrath, J.

Champlin, C. J. The decree in this case proceeds upon two grounds, which, it seems to me, are inconsistent with each other. The decree that complainant can maintain its dam can only be justified upon the ground that defendants are estopped by their conduct in standing by and seeing complainant expend $40,000 in the construc-

tion of its dam and erection of its mill, in violation of what the defendants claim is their right to set the water back above the place where such dam is located; and the award of damages in such large amount can only be justified upon the ground that they are not estopped by such conduct. Under the testimony, I agree that defendants should be estopped, and therefore should not be awarded damages on account of the acts of complainant, which defendants ought to and should have protested against at the time, and then, if complainant proceeded, it would have been at its peril, and the dam should then have been abated, and the complainant perpetually enjoined.

MORSE, J. I think the decree of the court below is wrong as to the damages.