FEIGE *v.* BABCOCK.

1. PARTNERSHIP—SALE—RIGHT TO ACCOUNTING.

The right of a member of a partnership to an accounting with a copartner in respect to the partnership business, and in respect to transactions before the formation of the partnership, whereby the amount to be paid by the former for his interest was to be determined, is not defeated by a sale of their respective interests in the firm property and business to a third person, where neither contemplated that such right would be lost by the sale.

2. SAME—CONTRACTS—INTENT—EQUITY.

Although a literal construction of the contract by which the partner acquired his interest would permit him to be charged in an accounting with a given proportion only of the cost of the partnership property as shown by vouchers, moneys actually paid out in the business prior to the sale to him, for which no vouchers can be produced, but of which there is legal evidence, may be considered in the adjustment, if it appears from the whole contract that both parties intended that the amount to be paid should be determined by the sum so invested.

3. SAME.

A member of a partnership is entitled, upon an accounting after a sale of the interests of both partners, to a credit for the amount of the firm debts paid by him in excess of the amount assumed by the purchaser of their interests.

4. SAME—COSTS—INTERLOCUTORY DECREE.

The costs, in proceedings for an accounting between partners, should await the final decree, although the interlocutory decree upon reference to a commissioner is most favorable to the complainant, where the amount of the interests involved cannot be ascertained until the commissioner makes his report, and the defendant has obtained affirmative relief by way of a reformation of the partnership contract; especially, if the provisions of the decree prescribing the manner of taking the account are modified upon appeal.

5. ACCOUNTING—RIGHT TO TAKE TESTIMONY—LACHES.

Where several years elapse after the commencement of a suit for a partnership accounting, and the record of the proceedings prior to a reference to a commissioner to state the account is very voluminous, embracing testimony taken, at great expense in several States, and the circumstances are such as to show clearly that the omission of certain testimony is the fault of the party claiming its benefit, an order permitting such testimony to be taken is properly denied.

6. EQUITY PLEADING—PARTNERSHIP ACCOUNTING—CROSS-BILL.

One whose rights in a partnership business have been violated by a sale of the firm property by his copartners, in whose names it stood, may file a cross-bill to obtain affirmative relief in respect to such interests in a suit instituted by one of the partners for an accounting.

7. SAME—AMENDMENTS—COVERTURE—ESTOPPEL.

The refusal to allow a party to a bill for an accounting to amend his pleadings so as to allege the coverture of the other party, and the consequent invalidity of the contract upon which she bases her rights, is not an abuse of discretion, where it would be manifestly inequitable to urge such objection, and the applicant delayed for a long time in seeking to interpose it after learning of the facts.

Appeal from Saginaw; Daboll, J., presiding. Submitted November 13, 1896. Decided February 2, 1897.

Bill by George Feige against Helen M. Babcock and Samuel G. M. Gates for a partnership accounting. Defendant Babcock filed a cross-bill against complainant and defendant Gates. From the decree rendered, defendant Gates appeals. Modified and affirmed.

*Camp & Brooks*, for complainant.

*Hanchett & Hanchett*, for defendant Babcock.

*C. L. Collins* (*Humphrey & Grant*, of counsel), for defendant Gates.

MOORE, J. The bill was filed in August, 1889, by complainant, for the purpose of obtaining an accounting between Feige, Gates, and Babcock, doing business under

the firm name of the Michigan Lumber Company. It alleges that on the 15th day of February, 1888, they entered into articles of copartnership for the purpose of manufacturing, etc., under the name of the Michigan Lumber Company, and states that the partnership was to date from February 15, 1888, and continue for three years, unless sooner dissolved by mutual consent. The articles of copartnership are made a part of the bill. They show that Gates owns 13-24 of the property, Feige owns 8-24, and Babcock 3-24, subject to the contract with the Seminole Lumber Company. By the articles, Feige was to be the general manager of the business. Babcock was to be represented by her husband, John W. Babcock, as assistant manager, who was to receive $1,000 per year. An agreement between the Seminole Lumber Company and Samuel G. M. Gates, of date the 27th day of October, 1887, is made a part of the bill. This agreement recited that on the 4th day of October, 1887, the Seminole Lumber Company agreed to sell to Gates and Helen M. Babcock a large quantity of lands, situated in the county of Baldwin, State of Alabama, and county of Escambia, State of Florida, upon the terms named in the contract; that, after making this agreement, another agreement was made, by which the lands were to be purchased by Gates, and Helen M. Babcock's interest protected by a contract between herself and Gates. A contract between Gates and Feige, of date February 15, 1888, is also made a part of the bill of complaint. This contract is for the purchase by Feige of one-third of all the benefits and advantages of the contract with the Seminole Lumber Company. Another contract is made a part of the bill of complaint, bearing date October 27, 1887, between Babcock, Gates, and Feige, by which Babcock releases Gates from her right to acquire one-fourth of the property, and reserves only the right to acquire one-eighth. It provides for the employment of John W. Babcock for the term of three years, at an annual salary of $1,000.

The bill alleges that Feige went to Millview, Fla., and

assumed the management of the business; that, when he arrived there, he found that large lumber contracts had been let by Gates and Babcock; that he continued in charge of the business as manager, and they carried on the business of manufacturing, selling, and shipping lumber and timber, until the 30th day of March, 1889, when they closed down, for the reason that Gates and Babcock refused to furnish their share of the money necessary to carry on the business; that on the 30th day of March, 1889, with the knowledge and consent of Gates and Babcock, he sold out his interest in the copartnership property and assets to Bucki, Bucki assuming to pay the firm liabilities to the extent of $49,000; but that in such sale he reserved all the rights which he had against his copartners for advances in excess of his share, and the right to call them to an accounting. He alleges that he advanced a large amount in excess of his share; that, by reason of Gates' and Babcock's failure to contribute their share to the business, they were obliged to borrow $15,000 from the Merchants' Bank of Pensacola, and to secure the payment thereof by mortgage upon their personal property; that, to meet this mortgage indebtedness when it became due, they were obliged to sell their lumber at a sacrifice. The bill further alleges that the $13,572.99 which the complainant agreed to pay Gates for his interest in the property was based upon the producing by Gates of vouchers showing that the property up to that date had cost him three times this amount, and that the amount which he was really to pay for the interest was to be increased or diminished by so much as the vouchers should show a less or greater sum to have been so paid by Gates; and he charges that the sum paid by Gates up to that date for the property was much less than three times the $13,572.99, and much less than Gates then represented it to be. The bill contains a prayer for an accounting, and for general relief.

The answer of defendant Gates to the original bill sets forth an admission of the execution of the written instru-

ments in the bill, but denies that the Gates-Feige purchase agreement sets forth the true agreement; admits the commencement of the business shortly after the 15th of February, 1888. and that it was carried on until the spring of 1889, under the name of the Michigan Lumber Company; admits a sale by Gates of his interest in the partnership property to Charles L. Bucki, subject to the rights of Helen M. Babcock; alleges that Feige sold his interest in the partnership property at the same time Gates did, and that the effect of such sales was to cut off the right of a further accounting between Gates and Feige; that it was a fact that complainant and Bucki making the agreement they did make was an inducement to Gates to sell to Bucki; that Gates did not know personally of any reservation in the sale of Feige to Bucki, and that, if such reservation was made, it was a fraud on Gates; denies that Feige furnished more than his share of the partnership money, and alleges that, on an accounting, the other parties will owe Gates; alleges that, by agreement, Feige was the manager of the company, but did not manage it profitably, and abandoned it about April, 1888, by reason of which facts defendant has a claim against Feige of $10,000; that, before the purchase by Feige, Gates had expended more than $34,000 in advances for the business and as purchase price of the property; that the agreement by which Feige purchased was that Feige was to pay $3,000 more than one-third of the cost of said property and advances thereon, and that an omission to set forth this provision in the contract was a mistake. The answer prays that the answer be treated as a cross-bill for reforming said Gates-Feige contract; that said contract be reformed so as to show Gates' right to said additional $3,000, and that it be decreed that Feige shall pay it to Gates; that Feige pay Gates any balance found on accounting.

Mrs. Babcock filed an answer to the original bill, and a cross-bill, which sets forth the filing of the original bill, and the proceedings thereon, up to and including the

replications to the answers to the original bill, and alleges the pendency of the suit; that she is the wife of John W. Babcock; and describes his experience as a lumberman, and his discovery of the property in controversy; describes the same in general terms, the same being generally described as the property of the Seminole Lumber Company, Limited; that he gave his information respecting the property to the defendant Gates, who, it is alleged, was then a man of large means, notifying said Gates that it was the wish of Helen M. Babcock to pay for an interest in the property out of the proceeds thereof and of the business carried on in connection therewith, said John W. Babcock to be connected with the business; that Gates was desirous of entering into the arrangements as thus proposed; that pursuant to this arrangement, about October 4, 1887, Gates and Helen M. Babcock entered into an agreement for the purchase of this property, which was followed by a new agreement of purchase, dated October 27, 1887, this agreement being only between themselves, pursuant to which agreement Gates made a purchase of the property from the Seminole Lumber Company, dated October 27, 1887; and it is alleged that, in making the contract and purchase, it was understood that Helen M. Babcock had no means except they should be derived from the proceeds of the property and business, and that Gates agreed that he would make payments and advances for the purchase of the property, and allow Mrs. Babcock to repay Gates for her share of such advances out of her share of the property and business, and that John W. Babcock should be empolyed therein; that, after the purchase was made, Helen M. Babcock and Gates proceeded at once, as partners, to lumbering said property, and that in order to carry on the business, and with the intention and understanding that he would make advances to her, which would be repaid out of the business, Gates made the written agreement of November 12th with Mrs. Babcock, which is set out in the cross-bill; that Gates and Mrs. Babcock, as such pur-

chasers, and as partners, in the interest of three-fourths to said Gates and one-fourth to Mrs. Babcock, took possession of said property, and carried on such business pursuant to such intention; that John W. Babcock was employed in the business at $50 per month.

The cross-bill further sets forth that said property was treated, and intended to be, and was in fact, the partnership property of Gates and Mrs. Babcock; that said business was a partnership business, and was continued until about the 15th day of February, 1888, when George Feige sought to purchase from Gates an interest in said property and business; that Gates desired to introduce said Feige into the business, by selling a portion of his interest in the property to Feige; that Mrs. Babcock was unwilling to enter into this arrangement, lest it would interfere with her contract with Gates in respect to the property; that her unwillingness was explained to both Gates and Feige, and that she was assured by both of them that her interests would be promoted by the proposed sale from Gates to Feige; and that, relying upon such statements, she consented to reduce her interest in the property to one-eighth, instead of one-fourth, which was accomplished by a contract which was made on or about the 15th day of February, 1888; that said contract was signed by her relying upon said statements and agreements of Feige and Gates, and that no change of understanding or arrangements was made as to her right to pay for her interest out of the proceeds of the property and business; that thereupon Gates sold one-third of the property to Feige by a contract dated February 15, 1888, and that at the same time a copartnership agreement was made between Gates, Feige, and Mrs. Babcock, dated February 15, 1888, which was intended by the parties thereto as the means of lumbering said property, and enabling Mrs. Babcock to pay for her interests therein; that, by means of said contracts, all of the property and the business carried on therewith became the partnership property of Gates, Feige, and Mrs. Babcock, in the shares

and interests of 8-24 thereof to Feige, 13-24 to Gates, and 3-24 to Mrs. Babcock; that it became the right of Mrs. Babcock to have the purchase contract with the Seminole Lumber Company, Limited, carried out, and to have said partnership continued, and said business carried on, and said property made use of in said business, for the full term provided by said contract; that neither Feige nor Gates had the right to terminate the same at an earlier date than provided by the contract, without her consent; that, pursuant to the contract agreement, the parties entered into and carried on business.

It is further alleged that about June 22, 1888, Gates commenced negotiations with parties for the sale of two-thirds of said business and property, which negotiations resulted in a sale and transfer thereof by him to one Charles L. Bucki; that Feige also sold a third interest in said property and business to said Bucki; that, by such sales and transfers, the entire property and business was transferred to Bucki, the firm dissolved, its business terminated, and Mrs. Babcock was deprived of its advantages and all her opportunity to purchase under it; that Mrs. Babcock did not sell or transfer her said business; that, by the sale above set forth, the business was broken up, and her opportunity to realize out of said property, and pay for her part of the same, was destroyed; that, in respect to said business, her husband, John W. Babcock, acted for her, and represented her in all respects as fully as she could herself in his place; that Feige and Gates made large profits in the sales they made to Bucki; that the conduct of Feige and Gates and their sale destroyed the business, and her power to proceed therein and save her interest therein, thereby causing her loss and damage to the amount of many thousand dollars; that she was ready to perform the contract on her part all of the time; that she made a tender in May, 1889, of the contract amount falling due in February, 1889; that such tender was made to Gates and the Southern States Land &

Lumber Company; that, by the acts of Gates and Feige, she was wholly excluded from and deprived of all her rights in the property and business, the partnership, and its assets, and to the purchase of one-eighth of said property, which was worth many thousand dollars more than she had agreed to pay for it; and that no account of the business has been had. It was the prayer of the cross-bill, among other things, that a partnership accounting be had between the three parties; that an accounting be had as to the sale of the property and business, so that the interest of Mrs. Babcock in said partnership business, and in said property and business, be determined and decreed; that the loss or damage she has suffered through the acts and conduct of Feige and Gates be settled and determined, and that Feige and Gates be required to pay the amount due her on such accounting; and that they, one or both of them, be decreed to pay said amounts, and to pay to her an equitable share of the proceeds of the sale of said property; and a prayer for general relief.

The answer of defendant Gates to the cross-bill admits the execution of the papers set forth in the cross-bill; admits that John W. Babcock brought to the notice of defendant the property in question; says that Mrs. Babcock was unable to carry out the purchase of October 4, 1887, and that, consequently, the agreements of October 27, 1887, were made; that between the 27th day of October, 1887, and the 15th day of February, 1888, no agreement as to advances by Gates to Helen M. Babcock other than the agreement of November 12, 1887, was made; that no specific amount was agreed upon to be advanced, and that the arrangement for the advance made by this agreement was a temporary one; that it was through the solicitation and consent of Helen M. Babcock that the negotiations and sale to Feige were made; that the business of the partnership was not profitable or satisfactory to any of the parties, and that its continuation would not have worked out a payment of the interest of Mrs. Bab-

cock therein; that it was with Mrs. Babcock's consent that negotiations were carried on for the sale of the interest of Gates in the partnership; that, in making the sale, the parties who purchased the property purchased with notice of the rights of Mrs. Babcock therein, and without prejudice to her rights; that the papers setting forth the sale stated that the sale was made subject to the rights of Helen M. Babcock; that, as to the sale actually made to Charles L. Bucki, the same was made with the knowledge and consent of Mrs. Babcock. In February, 1893, the defendant Gates moved the court to be allowed to amend his answer to the cross-bill, so as to show that when the various contracts were made, to which Mrs. Babcock was a party, she was then a married woman; that the contracts were made in Florida; that they related to real estate, and, according to the laws of Florida, were void. This motion was denied, with leave to renew it on the hearing of the cause. This was done, and it was again denied.

The printed record contains more than 1,000 pages of testimony, and the record is not all printed. In February, 1896, a decree was made, in which it is found, in substance, that the said Samuel G. M. Gates and the Seminole Lumber Company, Limited, executed the contract dated October 27, 1887, by which said Gates purchased of the Seminole Lumber Company, Limited, the lands and property mentioned in said contract, on the terms therein stated, consisting of pine lands and sawmill property, and that Gates and Helen M. Babcock contemporaneously executed the contract of date October 27, 1887, by which Gates agreed to sell to said Helen M. Babcock an undivided one-quarter of said lands and property, upon the terms stated in said contract; that, under said contract, Gates and Helen M. Babcock took steps for lumbering on said lands and operating the mill situated thereon, constituting a part of said property; that, with a view to such lumbering operations, Gates and Helen M. Babcock executed the contract dated November 12, 1887, by which

Helen M. Babcock agreed to pay the said Gates interest at the rate of 10 per cent. per annum on all moneys advanced by Gates for the carrying on of said business; that, under the three contracts, said lumbering business was carried on by Gates and Helen M. Babcock until the 15th day of February, 1888; that Gates advanced moneys to carry on the business; that on February 15, 1888, Gates and Feige executed a contract by which Gates sold to Feige an undivided one-third of said land and property, and that at the same time Helen M. Babcock and Gates and Feige executed a contract, by which Helen M. Babcock released to Gates the right to purchase the undivided one-quarter of said land and property, and reserved the right to acquire an undivided eighth of said land and property; that, at the same time, Gates, Feige, and Helen M. Babcock executed a contract, dated February 15, 1888, by which Gates, Feige, and Helen M. Babcock made and entered into a copartnership under the firm name of the Michigan Lumber Company; that said three last-mentioned contracts were executed contemporaneously, and, upon their execution, Gates, Feige, and Helen M. Babcock proceeded to carry on a lumbering business with said land and property, which business was carried on in the name of the Michigan Lumber Company; that, in carrying on the business, Gates advanced certain moneys; that, by virtue of said contracts, Helen M. Babcock was entitled to acquire an undivided one-eighth of the lands and property, and was entitled to have the copartnership business carried on, and to have the share of the profits thereof, belonging to her, applied to the payment of the sum owing by her to Gates for advances made by him, and to the payment of the purchase price for said undivided one-eighth of said lands and property to be paid by her to Gates; that Gates and Feige sold to Bucki all the partnership property of the said Michigan Lumber Company, and it was transferred to Bucki, and, by said transfers, said partnership was terminated; that the sale and transfer made by Gates to Bucki was made by said Gates without the consent, and

against the protest, of said Helen M. Babcock; that, on the 15th day of February, 1889, the sum of $2,500 became due from Helen M. Babcock to Gates, upon the purchase price of an undivided one-eighth of said land and property, and afterwards, and on the 25th day of May, 1889, said Helen M. Babcock tendered payment to Gates, which tender was refused; that the rights of said Helen M. Babcock as purchaser of said one-eighth of said lands and property were preserved.

The decree provided for an accounting, and the manner of it, and decreed that—

"It will be referred to Hon. Chauncey H. Gage, special commissioner, of Saginaw, to take and state the account between Gates and Helen M. Babcock, and to report the same to this court. Such accounting is to be made upon the files and records of said cause, and the testimony heretofore taken therein. It is decreed that Mrs. Babcock is entitled to her costs upon the cross-bill, to be taxed.

"It is also decreed that the $13,572.99 named in the contract of date February 15, 1888, includes the $3,000 which in these proceedings is termed a 'bonus' to be paid to Gates by Feige for the privilege of acquiring one-third interest in said property; that the balance of $10,572.99 was assumed to be one-third of the amount, with interest thereon, paid by Gates for and on account of the property conveyed to Feige under said contract, prior to such conveyance, but of this assumed amount only such part thereof is payable to Gates under said contract as the vouchers produced by Gates show payment for and on account of the property conveyed by said contract; and that said sum of $10,572.99 assumed to be payable to Gates shall be lessened or increased by so much as said vouchers show payments of a greater or less amount than that sum.

"Feige, under the contracts set out in this bill, paid money to Gates upon the purchase price of his interest in said property, and advanced money for the carrying on of the business; and he paid money to Gates on account of his purchase of the one-third interest in the property by paying it to the Michigan Lumber Company for Gates. It is decreed that Feige is entitled to an

accounting against Gates for all the payments and transactions made and had by Gates in connection with the property prior to Feige's purchase, and for moneys paid Gates after the purchase, and for money paid to the Michigan Lumber Company on account of purchase. And he is also entitled to an accounting against his copartners, Gates and Helen M. Babcock, of and for all business transactions and doings of the Michigan Lumber Company, and of and for all moneys and property which each of the copartners have paid to and for the Michigan Lumber Company, and of and for all moneys and property which each of the copartners have received from said company, and of and for all moneys and property at any time owned by said company. The basis upon which the accounting is to be had is that Gates is the owner of 13-24, Feige is the owner of 8-24, and Babcock is the owner of 3-24, of said property and interest in the copartnership; and, Gates having agreed to furnish Babcock's share of the contributions, advances, and payments to the company, he is chargeable, on an accounting, with the payment of the 3-24 which Babcock's interest should make.

"By the contracts of the parties, Gates and Feige were each to receive a salary of not less than $1,000 for the first year, and not less than $1,500 for subsequent years, and John W. Babcock was to receive a salary of $1,000 each year. These salaries will be allowed for the time in which the respective parties were acting for the benefit of the company, except as they are modified by the court upon the report of the commissioner, on testimony which may be taken before him concerning the connection of Gates with the McLennon mortgage, and further consideration of the testimony already taken upon Gates' connection with the McLennon mortgage. The salary of J. W. Babcock will be an allowance to Helen M. Babcock. The time which each of the copartners are entitled to receive the salary, and the amount of salary to which each would be entitled, without reference to the question of Gates' connection with the McLennon mortgage, will be reported by the commissioner separately from the other items in his report.

"It is further decreed that the whole matter in controversy between the parties be referred to said circuit court commissioner, to take and state an account between Feige and Gates, and between Feige and Gates and Babcock,

upon the basis herein indicated, and report the same to the court. In making and stating the account between Feige and Gates of the payments and disbursements claimed to have been made by Gates for and on account of the property purchased by Feige, and for and on account of the business carried on in connection with said property before the date of Feige's purchase, the commissioner will not allow any payments or disbursements claimed to have been made by Gates for which there are no vouchers; and checks, drafts, or orders payable to Gates or order, Gates or bearer, or payable to bearer, or payable to any party whose name Gates is authorized to sign, shall not, for the purpose of this accounting, be considered as vouchers. The commissioner, in such accounting, will give Gates credit for only such sums paid by him after he and Feige sold out as he has shown affirmatively exceed $50,000, and he shall give him credit for payments in such cases only when such payments have been made with Gates' money, and have not since been repaid him. Gates is not entitled to receive credit in the accounting for any payments or disbursements made by him after the 15th day of June, 1888, while he acted as the agent for Bucki. In the accounting, the commissioner shall take, state, and report an account agreeable to the practice of the court, between the parties:

"*First.* As to the true amount of moneys paid by Gates to the Seminole Lumber Company at the time of the purchase by Feige of his one-third interest in the property under the contract of February 15, 1888, as determined by the vouchers which the said Gates has submitted therefor.

"*Second.* As to the true amount of moneys before that time advanced and paid by Gates for the Michigan Lumber Company, or on account of the business of himself and Babcock, other than for the real estate, and which Gates claims enter into the $13,572.99, as shown by vouchers produced by him, entitled to be considered under the direction respecting vouchers hereinbefore contained.

"*Third.* To make, state, and report a true account of all the money received by the Michigan Lumber Company, and a like statement of all the moneys disbursed in the course of operations of said company: (*a*) From the date of the purchase by said Feige down to the 22d day of June, 1888, when Gates gave his option for the sale. (*b*) A like account from said date of February

15, 1888, to March 30, 1889, when Feige sold and disposed of his interest therein. (c) A like statement of such account extending from February 15, 1888, to the time of the final delivery of possession to Bucki, or to his assignees, of all the property and assets of the Michigan Lumber Company, and conclusion of its business. (d) To make, state, and report the account, separately, of the said Gates with said Michigan Lumber Company, showing all moneys advanced by him to said Michigan Lumber Company in the course of its business, and all moneys received by him therefrom, exclusive of salary, and showing what, if any, sum he paid on account of the McLennon mortgage, and any sum repaid him from or through the action taken on the McLennon mortgage. (e) To make, state, and report a true account between the said Feige and said Michigan Lumber Company, showing all moneys advanced by him to said Michigan Lumber Company in the course of its business, and all moneys received by him, exclusive of salary, making in both cases rests at the date of the respective sales by Feige and by Gates, so as to indicate the state of the account at the date of such sales, as well as at the conclusion of the business. (f) Also to make and state an account, separately, showing the character and value, as near as may be, of all the assets, independent of land, owned by the Michigan Lumber Company at the time of the sale by Feige and Gates to Bucki, and also the indebtedness, in itemized form, owing by the company at the time of making of such respective sales, and also at the time of the final delivery of the property into the hands of said Bucki or his assignees.

"And, for the purpose of such accounting, the said commissioner shall have access to and examine all the records of this case, and all the testimony heretofore taken therein, and no other, except that the commissioner shall take, consider, and return, as a part of his report, testimony of such witnesses as shall be produced, concerning Gates' connection with the 'McLennon Mortgage,' so called.

"It is further ordered, adjudged, and decreed that the said George Feige is entitled to receive his costs of this suit upon the original bill, to be taxed."

Defendant Gates appeals from the decree, and in an original brief of nearly 100 pages, followed by a supplemental brief of nearly 50 pages, states his reasons for the appeal. They have all had careful consideration, but the

interests of the parties and the public do not require a discussion of them all here.

It is claimed by defendant Gates that, when Feige and Gates sold to Bucki the business and property, these sales conveyed to Bucki all the interest that both of them had, and that neither of them after that could require the other to account for the contracts made between each other which resulted in the partnership, and for the business done during the existence of the partnership, and that, therefore, the original bill must be dismissed, and that the dismissal of the original bill would carry with it the cross-bill. The contention of the solicitors for Mr. Gates cannot be sustained, for the reason that the record shows very clearly that neither Mr. Feige nor Mr. Gates expected that the result of the sale to Bucki would relieve either from accounting to the other for the results of the business during the existence of the partnership, nor was it expected by either of them that Mr. Gates was to be released from the contract he made with Mr. Feige, when the latter entered into the partnership, that he would produce vouchers showing the cost of the plant and business up to that time, and that the amount paid for a third interest in the business by Mr. Feige should be adjusted upon the basis of the cost to Mr. Gates, up to that time, upon the terms of the contract, less the $3,000 bonus which Mr. Feige was to pay for being allowed to come into the business. We think the complainant was entitled to a decree for an accounting.

In this connection we should determine whether the circuit judge erred in decreeing that the commissioner, in making an accounting as to the amount of the cost of the property to Gates at the time Feige became a member of the firm, and of the part thereof payable to Gates, should be limited, in determining the amount thereof payable by Feige to Gates, to the amount for which Gates produced vouchers. If the contract is to be literally construed, the decree is right; but we think the record clearly establishes that Feige was not only to pay a bonus of $3,000 for be-

coming a member of the firm, but that he was to pay to Mr. Gates one-third of what Mr. Gates had at that time invested in the business and property; and it would be inequitable in this equitable proceeding, commenced by Mr. Feige, to require Mr. Gates to lose what he had paid out on account of the property and business at the time Mr. Feige acquired an interest in the firm, one-third of which Mr. Feige agreed to pay, simply because Mr. Gates is not able to produce a written voucher showing the payment. We think the decree should be so modified as to allow the commissioner to consider any legal evidence in the case bearing upon that feature of it.

The decree provides that the commissioner, in the accounting between Feige and Gates for the business done after Feige became a member of the firm, should not credit Gates for any disbursements made by him after the 15th day of June, 1888, while he acted as the agent for Bucki. We agree with the circuit judge that, in the accounting, the partnership ought not to be charged with any of the debts assumed by Bucki, and that Mr. Gates ought not to be credited with any payments of debts contracted after he had sold to Bucki; but we think, in the accounting, that he should be credited with any payments he may have made of the debts of the firm consisting of Feige, Gates, and Babcock, in excess of the $50,000 assumed by Bucki, even though some of those debts were paid by him after June 15, 1888, and the decree should be modified in that respect.

Complaint is made of that portion of the decree giving costs to Feige against Gates. The decree gives Gates affirmative relief to the extent of reforming the contract made between Gates and Feige by finding that it was intended by the parties that Feige was to pay Gates a bonus of $3,000 for the right to purchase a one-third interest in the property. In view of that fact, the modifications made in the decree here as affecting Feige and Gates, and the uncertainty of what their respective interests are, until the commissioner has made his report,

we think the matter of costs between Gates and Feige should await the result of the final decree, and the decree will be modified in that respect, and neither of them will be awarded costs in this court against the other.

It is urged upon the part of defendant Gates that, in the accounting before Judge Gage, he should be allowed to put in further proof. More than six years have elapsed since this litigation commenced. The parties to it have had every opportunity to put in testimony bearing upon any phase of the case. The record is very voluminous. Not all of it appears in the printed record. The printed record contains more than 1,000 pages, and embraces testimony taken at great expense in several States. If there is anything omitted that is essential to the proper disposition of the case, it is the fault of the party omitting it. We think the case should proceed to a speedy determination, and we decline to direct further testimony to be taken except as provided for in the decree.

It is claimed by Mr. Gates, among other reasons, that the cross-bill cannot be sustained, because it makes a defense which was equally available by way of answer to the original bill, and that, as Mrs. Babcock takes no decree against Feige, she does not need a decree against Gates to make perfect a decree against Feige. We understand that "whenever it is necessary to bring all the equities of all the parties fully before the court, that even and complete equity may be done, as well in favor of the defendant as of the complainant, it becomes necessary to file a cross-bill; and this may be done by any or all the defendants, against any or all of the complainants, or by a defendant against his co-defendants, or a part of them, as the nature of the case may require." Put. Mich. Ch. (2d Ed.) 322; Story, Eq. Pl. § 392; *Andrews* v. *Kibbee,* 12 Mich. 94 (83 Am. Dec. 766); *Farmers & Mechanics' Bank* v. *Bronson,* 14 Mich. 372. We think this case comes clearly within the rule that a cross-bill is designed for the purpose of enabling a defendant to avail himself of some defense which can only be

made complete by granting him some affirmative relief against complainant or against some co-defendant. It is difficult to see how the equities of this case could be worked out between the complainant and the two defendants, and between the defendant Babcock and her co-defendant, Gates, and the complainant, Feige, so as to do justice to all of them, without the filing of the cross-bill. *Cornwell Manfg. Co.* v. *Swift,* 89 Mich. 503; *Worrell* v. *Wade's Heirs,* 17 Iowa, 96; *Wilkinson* v. *Roper,* 74 Ala. 140.

It is also urged that Mrs. Babcock cannot maintain her cross-bill, because, when she entered into the contracts with Mr. Gates, she was under coverture, and, by the laws of Florida, could not lawfully enter into such contracts. Three years and more after this action was commenced, Mr. Gates asked the court for permission to amend his pleadings, so as to enable him to interpose this defense. His application was denied. Mrs. Babcock and Mr. Gates made their contracts with each other, treating each other as residents of Michigan, and so describing each other in the contracts. The record shows the contract of October 4, 1887, was made in Michigan. This contract was changed by the two contracts made in Chicago, October 27, 1887. The contract of November 12, 1887, was made in Michigan, and was dated at Bay City, and Mrs. Babcock and Mr. Gates were both residents of Michigan; and the other contracts were made having in view that the parties were residents of Michigan, and competent to enter into contract relations. All the parties dealt with each other as though there were no disability. Their business relations were commenced, continued, and ended with the belief on the part of both of them that both were competent to make the contracts and engage in the business. In pursuance of her agreement with Mr. Gates, and because of it, Mrs. Babcock surrendered the interest she had in the Seminole Lumber Company contract, which was the right to purchase a one-fourth interest in 146,000 acres of land.

Because of the surrrender of this contract, a new contract was made out between the Seminole Lumber Company and Mr. Gates, it being expressly provided that Mrs. Babcock's interest in the previous contract should be protected by a contract between her and Gates. A new contract was drawn, in which Mrs. Babcock's interests were protected, if the contract was valid. Where one has contracted with a married woman, knowing her to be such, and the contract includes a contract of partnership, and the contract has been entered upon, and in part executed, and he has received substantial benefit therefrom by the surrender of a contract to which she was a party, and by conducting the partnership business for nearly two years, in an action brought by her to compel him to account for the results of the partnership, and for what he has received by virtue of the contract, is it not too late to plead coverture as a bar to her maintaining her action? Can it be the law that one can appropriate the fruits of such a contract, and at the same time disavow the contract? The business relations between Mr. Gates and Mrs. Babcock were entered into, both supposing they had a right to enter into such relations. Business was conducted by virtue of these contracts, on a large scale, for upwards of a year and a half. These relations were terminated by Mr. Gates, both parties still supposing Mrs. Babcock was competent to make the contracts. This litigation was commenced, and Mr. Gates, by the pleadings, admitted the making of the contracts, but claimed that Mrs. Babcock's acts were such as to release him from any liability to her; and the parties entered upon the taking of the testimony, and a large amount of expense was incurred. The testimony was taken, and the case was ready to be heard, before any suggestion was made that the contracts were not valid. It was not until 1891 that Mr. Gates learned what the law of Florida was in relation to the disability of married women to make contracts in relation to real estate. When he did learn, did he act promptly? No

application was made to the court to amend the pleadings until in 1893. It is true, an endeavor was made to excuse the delay. The trial judge had full knowledge of the situation. The case presented by Mr. Gates did not appeal very strongly to the sense of justice of the circuit judge, and, in the exercise of his discretion, he denied the motion to amend. In doing this, we do not think he abused his discretion, and we decline to interfere. *Haines* v. *Haines*, 35 Mich. 138; *Bussey* v. *Bussey*, 71 Mich. 504; *Mills* v. *McLeod*, 94 Mich. 627.

It is the claim of Mr. Gates that he sold his interest to Mr. Bucki subject to Mrs. Babcock's interest in the business. We do not think this claim is sustained by the evidence, but, if it were, Mrs. Babcock would not be bound by it. Her contract was with Mr. Gates, and she had a right to look to him for its performance. *Atkinson* v. *Scott*, 36 Mich. 18; *Weaver* v. *Aitcheson*, 65 Mich. 285; *Wright* v. *Dickinson*, 67 Mich. 580 (11 Am. St. Rep. 602).

We note the claim of counsel that the cross-bill interposes new controversies between defendants to the original bill, the decision of which is unnecessary to a determination of the controversy set up in the original bill between the complainant and defendants, and thereby becomes an original bill, and that, as there cannot be two original bills in one case, the cross-bill must be dismissed. We also note the claim that the case stated in the cross-bill is not sustained by the evidence, and the claim that Mrs. Babcock, by her husband, consented to the sale to Bucki; but we do not deem it necessary to discuss them.

The facts disclosed by the record fully justify the decree, except as herein noted. The decree will be modified in the particulars suggested, and affirmed, with costs to Mrs. Babcock against defendant Gates.

The other Justices concurred.