WILLIAM O. BUTLER v. ALPHONSE BERTRAND.

*Summary proceedings—Pleading—Title to land—Jurisdiction— Adverse possession.*

1. A circuit court commissioner, before whom summary proceedings to recover the possession of land are instituted, is not ousted of jurisdiction by a plea of title in the defendant.

2. The question of title can be raised under the statutory plea of not guilty; and, when it appears that this question is necessarily involved, the proceedings should be dismissed, whether pending before the officer before whom they were instituted, or in the circuit court on appeal.

3. A presumption of tenancy arises upon proof of title in the complainant, and of possession by the defendant, in summary proceedings to recover the possession of land; citing *Hogsett v. Ellis*, 17 Mich. 351.

4. The proof in this case is held not to justify a finding of adverse possession in the defendant; it appearing that his holding has been in plain recognition of the title of those under whom he entered into possession, and to whom he, as supervisor, repeatedly assessed the property, and that he never mentioned his claim to any one until complainant informed him of his purchase of the land, and offered him a lease of the same.[1]

Error to Marquette. (Stone, J.) Argued April 26, 1893. Decided October 2, 1893.

[1] For cases bearing upon the question of what constitutes adverse possession, see *Smeberg v. Cunningham*, 96 Mich. 378, and note.

Summary proceedings to recover the possession of land. Defendant brings error.    Affirmed.    The facts are stated in the opinion.

*Clark & Pearl,* for appellant.

*Ball & Hanscom,* for complainant.

HOOKER, C. J.    Complainant brought summary proceedings before a circuit court commissioner to recover possession of land.    Defendant brings error to the circuit court, where said cause was tried upon appeal.    The plea was "Not guilty;" that defendant owned the land in question, and that he had held undisputed possession of the same for more than 18 years before this proceeding was begun; and that the title to land cannot be tried in this form of action.

It is contended by defendant that the plea of title ousted the commissioner of jurisdiction, for the reason that title cannot be tried in summary proceedings.    The inverse of this proposition would be that by a plea of title (which requires no verification) a defendant could always defeat summary proceedings.

The statute (How. Stat. § 8295) mentions several cases where one entitled to the possession of land may resort to a summary and expeditious proceeding to recover possession thereof.    Before he is entitled to this remedy he must file a verified complaint, alleging his own right to the possession and an unlawful holding by the defendant.    How. Stat. § 8296.    A summons being served, the defendant may plead "Not guilty," or, if he fails to do so, the magistrate will enter such plea for him.    If he fails to appear, the complainant must still make proof of his claim.

A number of Michigan cases are cited to sustain the proposition that title to land cannot be tried in such proceedings.    About this there can be no dispute, under the

authorities of this State, or any other state to which our attention has been called; and when it appears that title is necessarily involved, the magistrate should dismiss the proceedings, as beyond his jurisdiction, and this is as true of the circuit court upon appeal as of the magistrate before whom the proceedings are instituted. See cases cited by defendant: *Bennett v. Robinson*, 27 Mich. 31; *Foss v. Van Driele*, 47 Id. 204; *Riggs v. Sterling*, 51 Id. 159; *Mulder v. Corlett*, 54 Id. 82; *Hoffman v. Clark*, 63 Id. 175 *et seq.* In none of these cases did the question turn upon the plea, and it is clear that the point may be raised upon the trial under the statutory plea. Not only do we find no authority in these Michigan cases to warrant the conclusion that jurisdiction may be affected by the plea, but the decisions of Nebraska and Wisconsin are against it. *Pettit v. Black*, 13 Neb. 142 (12 N. W. Rep. 841); *Lipp v. Hunt*, 25 Id. 91 (41 N. W. Rep. 143); *Newton v. Leary*, 64 Wis. 190; *Lumber Co. v. Philbrook*, 78 Id. 142. The case of *Newton v. Leary* holds not only that the question of title does not arise, but that it cannot be put in issue by the pleadings. It is a question of whether there is a wrongful withholding of the premises from the complainant. When this can be shown to depend upon a controverted question of title, it is the end of the case. Any other rule would produce the absurd result mentioned, of making a plea conclusive of the jurisdiction.

Upon the trial the court directed the jury to render a verdict for the complainant, holding that the defendant had failed to make proofs that would justify a finding of adverse possession; in other words, that there was no evidence to go to a jury tending to contradict complainant's *prima facie* case. If right in this the judgment should not be disturbed, unless by reason of the exclusion of some testimony that might have tended to establish it. A review of the facts becomes necessary.

In a supplemental brief it is contended that the cause should be reversed for the reason that the complainant did not show himself entitled to relief, aside from any question of title; but there is no assignment of error that would apprise complainant's counsel that the claim was made that he had proved no tenancy. It is plain that defendant's counsel were claiming that there was no tenancy, but nowhere in the record is the point raised that complainant did not make a *prima facie* case. We think, however, that when he proved possession by the defendant, and title in himself, the law raised the presumption of a tenancy. *Hogsett v. Ellis,* 17 Mich. 351.

To return to the question of adverse possession. The defendant testified that he first went upon the land with one Joseph L'Huillier, in 1873, to build a saw-mill, which they completed in the spring of 1874; that L'Huillier continued to be interested with him until he died, in 1876, when defendant continued to occupy the property as successor of the partnership, having purchased L'Huillier's interest after his death. In 1874 he built a house, and lived there. Mr. Clark, counsel for defendant, here stated that—

"Mr. L'Huillier made all the agreement with the party to go there. He is dead, and we cannot bring him here to prove it. Therefore it is competent for us to show what defendant did, his going on and occupation, and what the company did with him."

The witness further stated that the saw-mill cost about $3,000; that the house built in 1874 cost between $350 and $400; that he broke up some land, and made a little farm there, and ran the mill all the time, sawing in the summer the logs that he got in the winter; that he had nothing to do with the Bancroft Iron Co., further than to pay it for the pine that he bought from it; that he also bought pine from others; that he lived there to the present

time, operating the mill and improving the farm, and that no one claimed any rent until the fall of 1891, when the complainant said he had bought the property, and offered him a lease for five years more; that he told the complainant he would sign no lease, and that he would not move away "unless there was some consideration made;" that he meant pay for what he had got there,—paying for the place; and that he had claimed the place as his home and property all of the time since the death of L'Huillier. On cross-examination he said:

"I claimed it as my property to anybody that asked me about it. Nobody asked me about it, and so I didn't say anything about it. I didn't mention it to anybody until Mr. Butler spoke to me about it.

"I have been supervisor of that township for three or four years,—1886, 1887, and 1888. The assessment roll was always made by Mr. Byrne. from the old one to the new one. I had to sign it. I looked it over.

"Q. And always assessed this land to yourself, or to the Bancroft Iron Co. Which did you do? * * *

"A. I do know. I assessed it to the Bancroft Iron Co. I do not know whether they always paid the taxes while I was supervisor.

"Mr. L'Huillier went there before I did. He was there when I went there. It was after he went there that I formed a partnership with him. I never had any talk with the Bancroft Iron Co., or any of its chief officers, as to the arrangement under which I was there, or L'Huillier, before he died. The arrangement was made before I went there.

"Q. Then all you know about it is, you continued, after his death, to cut timber off from their lands, and saw it at the mill, and pay them $2 a thousand, down to sometime in 1881, when there was a general estimate made of what there was left, and that you were to pay some round lump sum for?

"A. Yes, sir. When I went there all I knew of the arrangement was what L'Huillier may have told me. * * *

"Q. Whatever the arrangement was under which you and L'Huillier entered upon the occupation of these premises, the same arrangement continued down to sometime in 1881, did it not, at the time when you made the estimate

of the pine,—this original arrangement, whatever it was,. continued down to that time?

"*A.* Yes, sir, and up to this day. I have a receipt for pine."

This receipt was introduced, and read as follows, viz.:

"MARQUETTE, October 23, 1882.
"Received of A. Bertrand four hundred and fifty dollars to apply on purchase of pine and rent of property, under agreement of June 16, 1881.
"BANCROFT IRON CO.,
"M. H. MAYNARD, Secretary."

"I don't know what he meant by rent of property. After L'Huillier's death, I had some talk with Morse about the agreement as to my right to occupy that property. I told him how I came there, and what L'Huillier said. I told him that we had built the mill on condition that the site was given to us. I explained to him just how it was, and asked him if we had any lease, or contract, or something. He said he didn't know as there was any lease, but he said it was all right. 'You go on, and cut the pine at the same figure,'—$2. No rent was mentioned. He never mentioned rent to me. Afterwards Mr. Maynard was agent for the company. He said something about rent. He made some kind of an agreement for me to sign about the pine, and include rent for the place. I did not sign it. I told him I would pay for the pine, and that was all I would do. I did not state the reason. The reason was that it was my property. I told him I would not sign it because I did not want to pay any rent. I also built a barn on this land."

The foregoing is the substance of all the proof in support of defendant's title. If this contained all of the elements of an adverse holding for the prescribed period, the question would have been a proper one for a jury, in which case the proceedings should have been dismissed. *Pendill v. Agricultural Society,* 95 Mich. 491; *Judson v. Duffy,* 96 Id. 255. Defendant's own testimony shows that he entered under L'Huillier, and that he (L'Huillier) entered by the assent of the Bancroft Iron Co. There is no evidence what that arrangement was, but the presump-

tion is that it was as a tenant.  *Hogsett v. Ellis,* 17 Mich. 351.  This being so, there is no room for a defense of adverse possession, it being settled that a tenant cannot turn a holding of this character into an adverse holding.

Again, under the facts proved and admitted, the holding was not hostile, but in plain recognition of the landlord's title, to whom the property was assessed by defendant himself repeatedly, and as late as 1888, while he admits that he never mentioned his claim to any one until he had the conversation with Butler, the complainant.

Under the facts, we think the circuit judge rightly directed a verdict for the complainant.

Judgment affirmed.

The other Justices concurred.