DUMMER *v.* UNITED STATES GYPSUM CO.[1]

1. STATUTE OF FRAUDS—EASEMENTS—ORAL AGREEMENTS—VALIDITY.
   An oral agreement for a right of way over land for a spur track is void under the statute of frauds.

2. EASEMENTS—ACQUISITION—PRESCRIPTION.
   Title to an easement may be acquired by prescription in the same time as required in the case of land.

3. SAME—ADVERSE POSSESSION.
   Title or rights in lands founded on prescription originate from the fact of actual, adverse, peaceable, open, and uninterrupted possession for such length of time that the law presumes that the true owner, by his acquiescence, has granted

[1] Rehearing denied September 10, 1908.

the land, or interest in the land, so held adversely; and where it appears that the claimant of an easement and his predecessors did not at any time before the interference complained of make uninterrupted use of the claimed easement for the statutory period of 15 years the claim of prescriptive easement fails.

Error to Kent; Wolcott, J.   Submitted May 8, 1908. (Docket No. 32.)   Decided July 13, 1908.

Trespass quare clausum fregit by William F. Dummer against the United States Gypsum Company and the Pere Marquette Railroad Company.   There was judgment for plaintiff against defendant United States Gypsum Company, and it brings error.   Reversed.

*Butterfield & Keeney* (*Albert N. Eastman*, of counsel), for appellant.

*Kleinhans & Knappen* (*Charles Henry Dummer*, of counsel), for appellee.

MOORE, J.   This case was tried before a jury.   At the conclusion of the testimony offered by the plaintiff, the trial judge directed a verdict in favor of the railroad company, but submitted the case against the other defendant. A verdict for $12,000 was rendered in favor of the plaintiff.   The case is brought here by writ of error.   The issues involved and the claims of the respective parties were so admirably stated by the late Judge Wolcott in his charge to the jury, that we cannot do better than quote therefrom:

"Gentlemen of the jury:   This is an action brought by William F. Dummer, as plaintiff, against the United States Gypsum Company and the Pere Marquette Railroad Company, as defendants.   The court has already stated to you that you should return a verdict of no cause of action as to the Pere Marquette Railroad Company.   I have already stated on the record the reason for directing a verdict as to that company, and will not repeat it again here.   So you will consider this case as if brought against the United States Gypsum Company alone.

"In order that the jury may have clearly before it the situation, I will state to you the theories and claims on the part of both the plaintiff and defendant. In stating these claims I do not intend to intimate what the opinion of the court might be as to any point. What the facts are and what claims on either side have been established by the evidence are solely matters for the jury to determine from the evidence in the case.

"The plaintiff's claim in this case is substantially this: That in 1873 the mill properties now owned by the plaintiff south of Grandville, on sections 19 and 20 of Wyoming township, were owned by the Grandville Plaster Company and the Grand River Valley Plaster Company, respectively, and that the property now owned by the defendant, the United States Gypsum Company, on sections 17 and 18, together with 15 acres on the south end of section 18, which now belong to one Olthoff, were owned by Dr. H. O. Weston. That upon section 20 was located a mill for the manufacture of gypsum products, which mill had at that time begun operations. That on section 19 a mill was then in process of construction, which mill was to be operated for the same purposes, and was in fact so operated after its construction. That on the property of Dr. Weston on section 18 was located a gristmill in active operation, and that Dr. Weston had also at that time the intention of putting up another mill on his property for the manufacture of gypsum products. That at this time, viz., in 1873, none of these mills had a side track or railroad facilities, but that a railroad was running through Grandville substantially east and west, and at a distance of about three-quarters of a mile from the mills of the Grandville Plaster Company and the Grand River Valley Plaster Company, called, respectively, the 'Red' and 'White' mills. This railroad was the same one that is now owned and operated by the Pere Marquette Railroad Company. That in the year 1873, under the conditions above stated, it was agreed by Dr. Weston and the owners of the red and white mills that all three mills should join in obtaining side-track facilities, and the plaintiff claims that to this end the owners of the red and white mills agreed that they would grade and complete, all ready for the ties and rails, a roadbed from the main line of the railroad substantially south through the village of Grandville and through the property of Dr. Weston, and down to the red and white

mills, this embankment and the track, when laid, to be used to connect all three mills with the main line of the railroad.

"The plaintiff claims that in consideration of this agreement on the part of the owners of the red and white mills to construct this roadbed and pay the entire cost thereof that Dr. Weston agreed to give to the owners of the red and white mills a perpetual right of way over his lands sixty feet wide upon a line agreed between them. The plaintiff claims that thereafter the projected line was surveyed and the owners of the red and white mills carried out their contract and agreement with Dr. Weston, and constructed at their expense and at a cost of between $3,000 and $4,000 the roadbed from the main line through the village of Grandville and across property owned by Mr. Hooper, for the right of way across which the owners of the red and white mills paid, and to the mill of Dr. Weston on section 19, and from that point to the red and white mills. The plaintiff claims that the grade and embankment and temporary bridge were completed ready for the ties and rails in 1873, with the exception of the short spur at the southerly end to the red mill, which was completed in 1874. The plaintiff claims that at once upon completion the representatives of the railroad company came to Grandville, and some agreement was made by which they agreed to put down ties and rails, and that the putting down of the ties and rails followed immediately after. And the plaintiff claims that this agreement with the said railroad was only supplementary to the one previously made between the then owners of the red mill and the white mill with Dr. Weston, and in furtherance of the same. The plaintiff claims that from the time of putting down these rails the owners of the red and white mills, now owned by Mr. Dummer, have continuously used this spur track for having conveyed in railroad cars to the railroad their manufactured products, and having conveyed to the mills from said railroad all their fuel and supplies down to the time of the temporary removal of the rails on the roadbed of the said spur track, and the right to the use of said main spur track was not interrupted until the time of the grievances complained of in this declaration. And the plaintiff claims that this user was continued, as above stated, excepting as the mills were from time to time shut down, and they had no occa-

sion to use the spur track until the fall of 1902, at which time the defendant, the United States Gypsum Company, tore out the bridge across Buck creek, which was a constituent part of the spur track, and the defendant thereafter refused to replace the bridge or to allow the said bridge and the rails to be restored. The plaintiff claims that because of the agreement made in 1873, as claimed and carried out by the owners of the red and white mills, the owners of the red and white mills entered into the enjoyment and possession of the right of way under a claim of right, and that thereafter all of the successive owners of the mills enjoyed and used the right of way and said spur track under said claim of right and without interruption by anyone. The plaintiff claims that until December, 1898, the owners of the red and white mills had never received any notice that their right to use the tracks was questioned in any way by the successive owners of the property now owned by the defendant, the United States Gypsum Company, and across which said side track ran, and that at the time of the first notice the side track in question had been used and enjoyed continuously whenever the mills were in operation for a period of substantially 25 years; and that at the time the plaintiff, who then owned the red and white mills and his predecessors in title, had acquired, as plaintiff claims, by such user an absolute right to the use of the spur track for hauling fuel, materials and products to and from the plaintiff's properties. The plaintiff claims that in 1901, while plaintiff's mills were temporarily idle, the Pere Marquette Railroad Company took up for temporary purposes and for use in another place, a part of the rails upon this spur track, but without intending the same as a hostile act as against plaintiff, or as a denial of his right to use the spur track in question, and that after the tearing down of the bridge by the United States Gypsum Company that the railroad company offered to replace the rails, and endeavored to prevail upon the defendant, the United States Gypsum Company, to allow the rails to be replaced and the bridge to be rebuilt. The plaintiff claims that the defendant, the United States Gypsum Company, refused to allow the same to be replaced. The plaintiff claims that he has also made verbal and written demands upon the said United States Gypsum Company to lay or permit to be laid ties and rails upon the roadbed of said spur track, but that the United States Gypsum Company refused to

accede to all of said demands. And the plaintiff claims that because of the destruction by the defendant, the United States Gypsum Company, of the bridge upon the right of way, and the refusal to allow plaintiff to use the right of way for a side track, which he claims as his right as an appurtenance of said mill properties, as aforesaid, that the plaintiff has sustained the damages for the recovery of which this suit is brought.

"Now, on the other hand, the defendant claims that in 1873 Messrs. Nearpass and Cahoon paid for the grading of the right of way in question, and it was constructed with the consent of Dr. Weston, the then owner of the property, and these three turned over the possession and control of this right of way to the railroad company under an agreement that the company should lay the ties and track and keep the same in repair and have absolute control thereof. The defendant claims that that arrangement was carried out. The defendant further claims that the railroad company is the only one other than the defendant who has ever been in possession or control of said property or run cars or engines over the track. The defendant further claims that at or soon after this time those mills were put in operation; that the white mill was shut down for a year during 1877 and 1878 pending foreclosure proceedings, again from November, 1884, to October, 1885, pending another foreclosure proceeding, and from June, 1886, to the fall of 1891, and from 1898 to 1906. The defendant claims the red mill was shut down from 1875 to 1878, and for approximately 10 years between 1881 and 1891, and from 1893 to date. The defendant claims that whenever these mills have been in operation, except during the summer and fall of 1891, that the railroad company has hauled cars, filled with their freight, over this side track. The defendant claims that from approximately 1887 to the fall of 1891 the tracks upon the Vandenbush property were torn up and were relaid under an agreement with Frank Noble, who was about to operate the red and white mills, whereby he paid $200 for the use of that portion of the right of way owned by Vandenbush, while he, Noble, operated the mills; that the red and white mills were purchased by the plaintiff at a foreclosure sale in 1896, were repaired, set in operation in the fall of 1897, and run until the spring of 1899, when the defendant claims they were shut down and not operated

again until 1906. The defendant claims that in December, 1896, Jenison, the owner of the property, served notice on the railroad company forbidding them to use this right of way; that in the summer of 1897 the Weston property was purchased by Messrs. Durr, Fulton, and Root; that before purchasing it they were assured by Mr. Jenison and the railroad company that the railroad company had no rights there except under a parol license. The defendant claims that in the spring of 1899 the Durr Plaster Company, who had purchased the property of Messrs. Durr, Root, and Fulton, served notice on the plaintiff to remove the tracks from section 17 and to desist from further using the entire road. The defendant claims that the railroad company were advised of this by the plaintiff, who requested them to compel the Durr Plaster Company to let them, the railroad company, remain in possession; that the railroad company refused to do this, and so advised the plaintiff; that the tracks were torn up on section 17, and within a year or so afterwards the railroad company voluntarily took up the tracks down to the Buck creek bridge. The defendant claims that the Durr Plaster Company constructed a permanent fence across the railroad track, fencing in their entire property. The right of way from which the tracks had been taken up soon grew up with woods and underbrush, and the Durr Plaster Company used the ground covered by the tracks running through their mill yard for rock storage. The defendant claims that in 1902 the Durr Plaster Company conveyed this property in its condition to the United States Gypsum Company by warranty deed, which company immediately went into possession. The defendant claims that in November, 1902, the United States Gypsum Company tore down the bridge and used the timbers for their work. At the time of doing this the local railroad officials protested and reported it to their superiors who paid no further attention to it. The defendant claims that no complaint or objection was made to this by the plaintiff or anyone else; nor did the defendant hear of it again until in November, 1904, when the plaintiff's attorney demanded the right to enter upon the property, relay the track and rebuild the bridge; that his demand was refused, and this suit was brought. This suit was brought against the United States Gypsum Company and the railroad company.

"The defendant further denies the existence of an ease-

ment or its ownership by the plaintiff.    It denies that in November, 1902, the plaintiff was in possession, and the defendant, with force and arms, entered upon this possession, ejected the plaintiff, tore down the bridge, and with force and arms kept the plaintiff ejected.    But, on the contrary, the defendant claims that it purchased the property in good faith, without any knowledge or notice of this easement, entered into possession, and in the ordinary course of business, and in good faith, to meet the demands of its business, took down this bridge.    The defendant claims that the railroad company is the only company who has had possession or control of this right of way, except the defendant and its predecessors in title.    The defendant claims that the railroad company was in possession, under a parol license, and claims there can be no prescriptive title, for the reason there has been no continuous, open, adverse and hostile possession of the plaintiff and its predecessors in title under a claim of right.    The defendant claims that the original entry was made under a verbal agreement with Dr. Weston.    The defendant claims plaintiff's title does not come from its predecessors, but that through a foreclosure proceeding of a mortgage given before Dr. Weston obtained title, which, the defendant claims, makes a fatal break in the chain of title, the statute could not begin to run prior to 1882.    The defendant claims that there are several subsequent breaks of a similar character in this chain of title, due to foreclosure proceedings; each one of which is a fatal break in the chain of continuity necessary to support a prescriptive title.    The defendant claims there was a hostile possession of a portion of this road from 1887 or 1888 to 1891, which possession, the defendant claims, was recognized by Mr. Noble.    The defendant claims that the plaintiff cannot claim a prescriptive right, unless he was in possession; that the only possession was that of the railroad, and that this possession must have been by contract or agency; and that in either event the plaintiff is bound by the acts of the railroad company, which company disavowed any title in 1897, the defendant claims, and voluntarily surrendered possession about 1901.    The defendant claims that the acts of negligence of the plaintiff and his predecessors in title estopped him from asserting any such title as against the United States Gypsum Company, who, the defendant claims, was a purchaser in good faith for value and without notice."

The record contains nearly a thousand printed pages, in which appear more than three hundred assignments of error, which are ably discussed in very voluminous briefs. Our view of the law as applied to the facts disclosed by the record is such that it will be unnecessary to discuss many of these assignments. The plaintiff had no record title to the easement. It is claimed that an oral agreement was made in 1872 or 1873 prior to or at the beginning of the easement. The trial judge rightly, as we think, said to the jury respecting that agreement, that, if made, it would be such an agreement as the statutes of this State require to be in writing, and, as an agreement, would be void.

It is the claim of plaintiff that he acquired a right to the easement by prescription. Upon that feature of the case the judge charged the jury as follows:

"Prescription, the term you have heard used here, is a mode of acquiring title to property or rights in property by long-continued possession, use and enjoyment; and in this State, if such possession, use and enjoyment is continued for 15 years it is presumed that a grant of the right was originally made. Such use and enjoyment, however, in order to ripen into a prescriptive right, must be adverse, exclusive, continuous and uninterrupted, under a claim of right, and with the knowledge of the owner of the land over which the right of way passes, or else used so openly and notoriously that the owner would be presumed to have knowledge. The term 'adverse' means a use under a claim of right and known to the owner of the land, a use without permission asked or given, a use of such a character that it cannot be accounted for except on the presumption of a grant. A use, on the other hand, which is permissive is not adverse and cannot become a prescriptive right, no matter how long continued. An acquiescence even for a long term of years between adjoining owners in the mutual use of switch tracks for their mutual convenience would not create an easement over defendant's lands, for the reason that such use would not be adverse or hostile.

"A license or permission to use is not hostile or adverse. To be adverse it must be under some claim of right. The claim of right need not necessarily be well founded. For

example, in this case, a parol agreement for a perpetual right of way, if any was made, would, as I have told you, be void and not enforceable. Still this would not necessarily prevent a person going into possession or enjoyment of the right of way under such agreement and using the same adversely and under a claim of right. If the original use of this right of way was by permission of Dr. Weston, and in the way of a license, then it would not be adverse, and would not become adverse so that the statute of limitations would begin to run, until the owner of the land knew that the user of the right of way was asserting a right to its use, hostile to his own rights. In considering this question you have a right to consider all the evidence as to the original agreement between Dr. Weston, and Mr. Nearpass and Dr. Cahoon, the use made of the right of way thereafter, what knowledge was had by Dr. Weston and his successors in title as to such use by the owners of the red and white mills and the railroad company. You may also consider the various deeds introduced in evidence of the property now owned by the plaintiff, such deeds, as I remember, all describing the lands and conveying the lands with the appurtenances, but making no specific mention of the right of way. I have also said that the use of this right of way claimed by plaintiff, in order to become a right by prescription, must not only be adverse, but also continuous and uninterrupted.

"What constitutes continuous use depends somewhat upon the nature of easement claimed. The easement claimed in this case is a right of way for a railroad track over defendant's land for the use of cars to carry away the produce of the mills, and to bring in supplies to the mills. A continuous use in such case does not necessarily mean a daily, constant and unintermittent use; but it means that the acts constituting the use shall be of such frequency as to give notice to the owner of the land of the right claimed against him. A voluntary cessation of the use for a short time would not constitute an interruption so as to prevent the acquirement of a prescriptive right, unless it appeared that the person enjoying the right has no intention of resuming the right or unless it was under such circumstances that the owner of the land now owned by the defendant had reason to believe that the owners of the red and white mills did not intend to resume the use of the track.

"It appears from the evidence that from sometime in

1886 until 1891, substantially five years, the mills now owned by the plaintiff were not in operation, and no use was made by them of the tracks. Whether such cessation of use would or would not interrupt the running of the time necessary to acquire a prescriptive right, depends somewhat upon the circumstances of the case. If the circumstances were such as would indicate that the owners of the plaintiff's mill had abandoned the use, or were not intending to longer assert any rights to the track (if you find they had been using it adversely before that time), or if the cessation of use was under such circumstances and for such a period of time that the owners of the land over which the tracks ran, would have reason to believe that the person using the tracks had abandoned the use, or were no longer asserting any right to use the tracks, then the cessation of the use would be an interruption of the running of the time necessary to give a right by prescription, viz., 15 years. On the other hand, if the cessation of use was under such circumstances known to the owner of the land over which the tracks were laid as indicated no intention to abandon the use, or forego any rights claimed therein, but was apparently only a nonuser for the period when the mills were not in operation, if the circumstances were such, you would be warranted in finding it was not such an interruption of the use as would be fatal to a claim of prescription. In considering this question you should consider all that the evidence shows as to the condition of the mills during that period, the condition of the track, the removal of some of the rails and ties, if there was such removal, and the purpose of such removal the taking out of some portion of the ties by Mr. Vandenbush, if he did, and the use made by him of any portion of the right of way or tracks, and the building of a fence across the track, or the placing of a gate therein. (I do not recall exactly the period when it is claimed these things were done, but I think sometime during this five years.) Also the evidence as to payment by Mr. Noble to Mr. Vandenbush for going on land then owned by him and relaying the track, and also if the evidence shows that it occurred during that time a request was made by Mr. Noble of Mr. Day for permission to relay the track.

" You may also consider the evidence, on the other hand, as to the reason for the closing of the mills, the organization of what was called, I think, the plaster pool

or agency, so far as the same shows, if it does, a reason for the closing of the red and white mills during that period, and the knowledge of Mr. Day, then in possession under a contract of purchase of the lands now owned by defendant, if the evidence shows that he did have knowledge of the facts in that regard.   There is evidence of other shorter periods when the mills now owned by the plaintiff were not in operation and the tracks not in use, and perhaps other instances of the taking up of other portions of the track.   I do not undertake to state the testimony, if any, in that regard.   As to any of these periods of cessation of use of these tracks by the plaintiff or his predecessors in title ( if they used them at all ), whether for longer or shorter period, the same rule I have given will apply.   It is for the jury, in consideration of all the evidence in the case, to say whether or not the plaintiff has shown a continuous, adverse, uninterrupted and exclusive use of these tracks ( as I have defined these terms ), and under a claim of right for 15 consecutive years prior to the acts of the defendant complained of.''

Was this a correct statement of the law as applicable to the facts in this case ?   It has already appeared that the use of the easement, if it was an easement, began in 1872. The expiration of the 15 years' use necessary to ripen into a prescriptive right would require the use to continue until 1887.   The parties are all agreed that title to an easement may be acquired by prescription in the same time as required in case of lands.   *Hoag* v. *Place*, 93 Mich. 450 (18 L. R. A. 39); *Williams* v. *Barber*, 104 Mich. 31; *Nowlin Lumber Co.* v. *Wilson*, 119 Mich. 406; *Toney* v. *Knapp*, 142 Mich. 652.   The record discloses that there were at various times periods of very considerable length . when the mills were idle and the easement not used, sometimes one or two years elapsing and an idleness of several years when the owners of the mills were parties to a pooling arrangement.   The defendant insists that the record is clear that the use was not continuous and uninterrupted within the meaning of the law, while it is the claim of plaintiff that in fact and law it was continuous.   The claim of plaintiff is stated in the brief of counsel as follows:

"Continuous and uninterrupted. Such periods as the mills were not in operation, and the track not in use did not constitute interruptions in the use of the easement. The test is simply whether the easement is used at the pleasure of the person claiming it without interruption. Continuous enjoyment for the statutory period is not destroyed by proof of occasional intermission in actual use. Constant user of an easement is not essential to the running of the statute. It is enough if used when necessary. *Cornwell Manfg. Co.* v. *Swift,* 89 Mich. 503; *Cox* v. *Forrest,* 60 Md. 74. A user is continuous if the easement is used at the pleasure of the person claiming it, without interruption. *Winnipiseogee Lake Co.* v. *Young,* 40 N. H. 420; *Collins* v. *Gray,* 3 Cal. App. 723. It is sufficient if used for the statutory period whenever desired. *Garrett* v. *Jackson,* 20 Pa. 331; Washburn on Easements and Servitudes (4th Ed.), p. 130. A use may be continuous though not constant—the test is if it is used whenever claimant chooses to use it. *Bodfish* v. *Bodfish,* 105 Mass. 317, 319. A voluntary cessation of user does not constitute a fatal interruption, unless it appears there was no intention of resuming its use. *Dana* v. *Valentine,* 5 Metc. (Mass.) 8; *Ferrell* v. *Ferrell,* 1 Baxt. (Tenn.) 329. Although a right is not exercised during some years for the convenience of the claimant, this does not necessarily amount to an interruption. *Earl De La Warr* v. *Miles,* L. R. 17 Ch. Div. 535; *Hesperia Land & Water Co.* v. *Rogers,* 83 Cal. 10. A mere intermission of use or nonuser does not amount to an interruption, unless it amounts to an abandonment. Nonuser is voluntary, and interruption is from without. Jones on Easements, § 189; *Carr* v. *Foster,* L. R. 3 Q. B. 581, 588; *Lawson* v. *Langley,* 4 Ad. & El. 880; *Hall* v. *Swift,* 4 Bing. (N. C.) 381; *Bodfish* v. *Bodfish,* 105 Mass. 317. The words 'continuous' and 'uninterrupted' are often applied to the user of an easement. These words have often been defined by the courts. We cite a few illustrative expressions: In *Swan* v. *Munch,* 65 Minn. 500, 503 (35 L. R. A. 743), it is said:

" 'Where the claimant needs the use of the easement from time to time, and so uses it, there is a sufficiently continuous use to be adverse, although it is not constant.'

"And, again, it is said:

" 'This is a continuous use, and an omission to use it when not

needed would not disprove a continuity of use, or defeat her (the claimant's) right to an easement by prescription.'

"In *Cornwell Manfg. Co.* v. *Swift*, 89 Mich. 503, the term 'continuous' is defined as applied to an easement. Of the use it is said:

" 'It must be continuous and uninterrupted, but not necessarily constant. It is necessarily an irregular use, depending upon season and rainfall; and it is sufficient if the use be the ordinary use, and be resorted to without interruption whenever necessary in the operation of the power.'

"This case involved a prescriptive right to overflow lands. In *Hesperia Land & Water Co.* v. *Rogers*, 83 Cal. 10, defining the term 'continuous use,' as applied to an easement, it is said:

" 'If, whenever the claimant needs it from time to time, he makes use of it, this is a continuous use.'

"If the claimant of an easement in real property needs its use from time to time, and so uses it, there is a sufficiently continuous use to be adverse although it is not constant."

Counsel also cite other cases.

Again we quote from the brief:

"(June, 1886—June, 1891.) The Plaster Pool. During this period it is practically undisputed upon the record that both mills of the Union Plaster Company were closed, and very slight use made of the spur track. Counsel for defendant rely very largely upon this period as constituting an interruption in the user of the easement, which is claimed to have broken up the prescriptive period so as to render the user prior to 1886 entirely nugatory. As we have shown heretofore in this brief, it is not continual use of an easement, in point of time, which is required for a prescriptive title, but continuous use in the sense that the person claiming the easement uses the same whenever he so desires. *Carr* v. *Foster*, supra, and many other cases cited. The proposition of law is thoroughly established that, as shown by the above-cited authorities, failure to use during a period of years does not interrupt the running of the statute, provided there is no intention to abandon. The sole test is whether the right of way was used whenever desired during the requisite period of years."

It will be observed that the claim of counsel, in effect, is that even though the owners of the mill thought it more profitable to enter into a pooling arrangement and stop their mills for a series of years, instead of running them, thereby making it unnecessary to use the easement, that the statute would run in favor of the owners, though there was no use in fact during that period. A reference to some of the cases cited will not sustain that claim. In *Hesperia Land & Water Co.* v. *Rogers*, 83 Cal. 10, in disposing of the case, the following language was used:

"The correct rule as to continuity of user, to give a presumptive right to an easement, and what shall constitute such continuity, can be stated only with reference to the nature and character of the right claimed. The right is not abandoned to the use of a ditch to convey water for purposes of irrigation because water does not flow in it every day in the year. The party claimant does not need the ditch every day in the year, and the law does not require him, to constitute continuity of use, to use the water when he does not need it. If he has used the ditch at such times as he needed it, it is regarded by the law as a continuous use. If a right of way over another's land has been used for more than five years, it is not necessary, to make good such use, that the claimant has used it every day. He uses it every day, or once in every week, or twice a month, as his needs require. He is not required to go over it when he does not need it, to make his use of the way continuous. The claimant is required to make such reasonable use of the way as his needs require. So it is of the ditch. If, whenever the claimant needs it from time to time, he makes use of it, this is a continuous use. An omission to use when not needed does not disprove a continuity of use, shown by using it when needed. (*Bodfish* v. *Bodfish*, 105 Mass. 319.) Neither such intermission nor omission breaks the continuity."

In *Cox* v. *Forrest*, 60 Md. 79, the following language was used:

"This is an action to recover damages for obstructing a private right of way, claimed over the land of the appellee. In the absence of an express grant, it was necessary

-for plaintiffs to prove an adverse, exclusive, and uninterrupted enjoyment of the right of way in question for twenty years.

"By adverse is meant a user, without license or permission, for an adverse right of an easement cannot grow out of a mere permissive enjoyment, the real point of distinction being between a permissive or tolerated user, and one which is.claimed as a matter of right.   Where one, however, has used a right of way for twenty years unexplained, it is but fair to presume the user is under a claim of right, unless it appears to have been by permission.   In other words, the use of a way over the lands of another whenever one sees.fit, and without asking leave, is an adverse use, and the burden is upon the owner of the land to show that the use of the way was by license or contract inconsistent with a claim of right.   *Bachelder* v. *Wakefield*, 8 Cush. (Mass.) 243; *Hall* v. *McLeod*, 2 Metc. (Ky.) 98; *Garrett* v. *Jackson*, 20 Pa. 331; *Tickle* v. *Brown*, 4 Ad. & El. 369; *School District* v. *Lynch*, 33 Conn. 334; *Hammond* v. *Zehner*, 23 Barb. (N. Y.) 473..

"By exclusive the law does not mean that the right of way must be used by one person only, because two or more persons may be entitled to the use of the same way, but simply that the right should not depend for its enjoyment upon a similar right in others, and that the party claiming it exercises it under some claim existing in his favor, independent of all others.   It must be exclusive as against the right of the community at large.

"Nor does the law mean by 'an uninterrupted and continuous enjoyment,' that a person shall use the way every day for twenty years, but simply that he exercises the right more or less frequently, according to the nature of the use to which its enjoyment may be applied, and without objections on the part of the owner of the land and under such circumstances as excludes the presumption of a voluntary abandonment on the part of the person claiming it."

In *Cornwell Manfg. Co.* v. *Swift*, 89 Mich. 503, the following language was used:

"Defendants have, however, rights of pondage upon the portions of section 17, from which they have been excluded, not only by grant, but by prescription as well. Occupation and a use of a right of flowage or pondage, in order to create a prescriptive right, need not be constant,

in the sense of a daily occupancy or use. It must be continuous and uninterrupted, but not necessarily constant. It is necessarily an irregular use, depending upon season and rainfall; and it is sufficient if the use be the ordinary use, and be resorted to without interruption whenever necessary in the operation of the power."

Without quoting further from the authorities cited by plaintiff, we may say of them that none of them stand for the proposition that the user of the easement may put himself in a position where he has no occasion to use the easement and then say that "the sole test is whether the right of way was used whenever desired during the requisite period of years."

The question of acquiring title by prescription is not a new one in this State. In *Rayner* v. *Lee*, 20 Mich. 384, Justice COOLEY, speaking for the court, said:

"The second objection made to complainant's title is, that, although he shows an unbroken chain of conveyances extending back more than twenty years, he does not show continuous possession under them, and consequently cannot claim title by adverse possession.

"This objection is based upon the facts, that on two or three occasions there were brief periods when the premises were not occupied at all, and that, at other times, there were persons in possession who are not distinctly shown to have occupied under any of the parties in complainant's chain of title. We attach no importance to the breaks in the possession. The evidence would indicate that they were only brief intervals between the departure of one tenant and the entrance of another; not at all indicating an intention on the part of the claimant to abandon his right. At no time were the premises vacant for any considerable period, and the evidence shows that in every year since 1842, some one under whom the complainant claims has assumed to be the owner, and has exercised public and notorious acts of ownership."

In *Yelverton* v. *Hilliard*, 38 Mich. 355, Justice GRAVES, speaking for the court, said:

"The defense is based upon a continuous adverse possession under the tax deeds for 10 years next preceding July 26, 1875, when the suit was instituted. The finding

is distinct as to such possession from that event back to January 4, 1866, when defendant received his deed. But the difficulty appears when we come to the interval between that date and July, 1865, a space of time required to make out the 10 years. Admitting, for the purpose of the question, that the fact as found in regard to Turner's entry and occupancy is sufficient for the time covered by it—that is, from the spring of 1865 until October or November of that year—and still there is a considerable space left between July, 1865, and the commencement of defendant's possession, January 4, 1866. As the finding reads, the premises were vacant from the time Turner took off his little crop of turnips in October or November, 1865, to the entry of defendant in the succeeding January, and during this period there seems to have been no adverse possession and no obstacle to an entry by the plaintiff. The finding, therefore, not only fails to show 10 years' possession under the tax deeds next preceding the commencement of the action, but, on the contrary, shows affirmatively that the possession was for a shorter period. The judgment is therefore not supported by the facts, and must be reversed."

In *Winchell* v. *Clark*, 68 Mich. 64, Justice MORSE, speaking for the court, said:

"The dam of plaintiff, at the time it was destroyed, had not been maintained long enough for her to acquire a right by adverse user to keep it there. It is not shown to have been built, for a certainty, before 1868, and it was torn down in 1882. The circuit judge was right in holding, as a conclusion of law, that the dam erected by the plaintiff invaded the rights of Clark & Amsden to their water privileges, and that its maintenance as against them was unlawful. He was also correct in the proposition that the flowing of defendant's land and the injuring of his water privileges by the dam of plaintiff was a nuisance which he had the right to abate. Wood on Nuisances (2d Ed.), pp. 976, 977; *Adams* v. *Barney*, 25 Vt. 231; *Hodges* v. *Raymond*, 9 Mass. 316; *Colburn* v. *Richards*, 13 Mass. 420; *Elliot* v. *Railroad Co.*, 10 Cush. (Mass.) 195."

In *Turner* v. *Hart*, 71 Mich. 128, Justice CHAMPLIN, speaking for the court, said:

"No grant of the right of flowage of the lands of com-

plainants is claimed. The defense rests upon rights acquired by prescription; and in such case the burden of proof is upon the defendants to show that they have, for a period of 15 years at least, each year flowed complainants' lands to the height complained of and established by their proofs, and that such use of complainants' lands by flowage has been adverse, uninterrupted, peaceable, open and notorious. No testimony was introduced to show that the effect of the old dam, with or without the flash boards, was to set the water back and to flow over complainants' lands to the height it has since 1881, nor to show that it so flooded the land as to interfere with or destroy the crops of complainants prior to that time, for a period of 15 years. This branch of the defense has utterly failed for lack of proof. It was claimed on the part of counsel for defendants that we should apply the rule adopted in Massachusetts, and laid down in *Cowell* v. *Thayer*, 5 Metc. (Mass.) 253, and approved in *Ray* v. *Fletcher*, 12 Cush. (Mass.) 200, that the height to which a mill owner will have a prescriptive right to maintain the water will depend upon the height of the dam by which he has raised it, and not upon the height such dam has set the water back and flowed the land in question during the prescriptive period; and, therefore, if he repairs the dam without so changing it as to raise the water higher than the old dam, when tight and in repair, would raise it, and thereby keeps the water more constantly and at a greater height than before, it is not a new use of the stream, but a use conformable to his prescriptive right. We cannot accede to this doctrine. It is antagonistic to the principle which underlies the doctrine of prescription. Title or rights in lands founded on prescription originate from the fact of actual, adverse, peaceable, open, and uninterrupted possession for such length of time that the law presumes that the true owner, by his acquiescence, has granted the land, or interest to the land, so held adversely. But no one can be said to acquiesce in a claim which he cannot dispute by bringing an action at law to determine; and hence the statute of limitations requires that an action shall be brought within 15 years after the right first accrues or the adverse entry. The defendants, therefore, acquired no right by prescription to the lands in question until they showed that the acts which constituted the adverse user injured complainants, and gave them, or to those under whom they claim title, a right of

action. *Holsman* v. *Bleaching Co.*, 14 N. J. Eq. 335; *Smith* v. *Russ*, 17 Wis. 234; *Sabine* v. *Johnson*, 35 Wis. 185; *Burnham* v. *Kempton*, 44 N. H. 90; *Griffin* v. *Bartlett*, 55 N. H. 123; *Mertz* v. *Dorney*, 25 Pa. 519."

In *Pendill* v. *Agricultural Society*, 95 Mich. 491, Chief Justice HOOKER, speaking for the court, said:

. " In the case of *Yelverton* v. *Steele*, 40 Mich. 541, Mr. Justice GRAVES, in stating the law upon the subject of adverse possession, said:

" 'The doctrine which sanctions the divestiture of the true owner by hostile occupancy is to be taken strictly, and the case is not to be made out by inference, but by clear and cogent proof'—supporting his opinion by numerous authorities.

" He quotes with approval the language of Mr. Justice Duncan where he says that 'it must be an actual, continued, visible, notorious, distinct, and hostile possession.' While it would have been the duty of the court to direct a verdict for the plaintiffs in case of the absence of the clear and cogent proof upon any one of these six requisites, he could not properly direct a verdict for the defendant unless each and every one of them was established by such proof, uncontroverted; for, the moment that any evidence fairly tending to disprove one of them was given, a question of fact for the jury arose, whether it was shown by plaintiffs or appeared from the examination of defendant's witnesses."

In *Judson* v. *Wiley*, 96 Mich. 255, Chief Justice HOOKER, speaking for the court, said:

" Where title to land is sought to be divested upon no better claim than occupancy, it can be justified only by clear and cogent proof upon each of the essential elements of adverse possession. *Yelverton* v. *Steele*, 40 Mich. 538; *Pendill* v. *Agricultural Society*, 95 Mich. 491. And, until each of these is supported by something more than an inference, the question should not be submitted to the jury. When there is evidence upon each of them which, if believed, can be said to establish adverse possession, the case should go to the jury. * * * This testimony was all admissible, but falls short of that 'clear and cogent proof' which permits the divestiture of title to land.

Some of the cases seem to have given rise to the assumption that adverse possession becomes a question for the jury when there is any admissible evidence tending to establish it, but we understand the rule to be that until the evidence reaches the required degree of clearness and cogency (which is manifestly a question for the court) there is nothing to go to the jury; and it is a clear duty of courts to protect the rights of landholders from the danger of capricious verdicts by refusing to allow consideration of the question of adverse possession by a jury until evidence sufficient to make a prima facie case, under the rule laid down in the case of *Yelverton* v. *Steele*, has been introduced. The jury should have been directed to render a verdict for the plaintiffs."

It should be stated that in this case Justices McGRATH and MONTGOMERY concurred for the reason that the possession was interrupted for several years. See, also, *Butler* v. *Bertrand*, 97 Mich. 59; *Beck* v. *Schick*, 110 Mich. 665; *Ann Arbor Fruit & Vinegar Co.* v. *Railroad Co.*, 136 Mich. 599 (66 L. R. A. 431).

Applying these principles of law to the case in hand, what do we find? The record discloses, not only that plaintiff has failed to establish his title to the easement by clear and cogent proof upon each of the essential elements of adverse possession, but the record discloses affirmatively that he and the previous owners did not, at any time before the bridge was destroyed, continuously and visibly for 15 years make use of the easement. A verdict should have been directed in favor of defendant. This conclusion makes it unnecessary to discuss the other assignments of error.

Judgment is reversed, and new trial ordered.

BLAIR, OSTRANDER, CARPENTER, and McALVAY, JJ., concurred.

HOOKER, J. I concur in the opinion that the nonuser stated in the above opinion, if it was adverse, is such as to defeat plaintiff's claim.