BUTCHER *v.* BURNS. .

ADVERSE POSSESSION — TRESPASS — TITLE—EVIDENCE—BOUNDARIES.
Evidence tending to show that the plaintiff had occupied
.a parcel of land between his land and defendants' as a
wood lot for 40 years and upwards and that the line as
claimed by him had been established by a survey some
40 years previous to the alleged trespass, and that later
a second survey had been made by the same surveyor
and acquiesced in by the person who then owned defend-
ants' premises made a *prima facie* case of adverse posses-
sion.

Error to Hillsdale; Chester, J. Submitted April 17,
1914. (Docket No. 61.) Decided June 1, 1914.

Trespass by John Butcher against Will Burns and
others for cutting timber on the property of plaintiff.
Judgment for plaintiff. Defendants bring error.
Affirmed.

*Victor Hawkins,* for appellants.

*Charles M. Weaver* and *Charles A. Shepard,* for
appellee.

MOORE, J. This is an action of trespass. The
damage alleged is for the cutting of two white oak
and one red oak tree on land described as—

"The land of the plaintiff situate in the townsnip of
Scipio, in said county, being the north half of the
west seventy acres of the northeast quarter of section
number twelve, town five south, of range three west,
the same extending to a line on the east surveyed and
established by George A. Mark, surveyor, on to wit,
December 1, A. D. 1870, as the east boundary line
thereon, and containing thirty-five acres of land, more
or less."

181 Mich.—2.

The defendants, who were workmen in the employ of Wells M. Spencer, engaged in clearing the east part of the above-described quarter section, admit cutting the three trees, but deny plaintiff's ownership of the land upon which the trees were situate. It is conceded that the three trees described in the proof were not situate upon the N. $\frac{1}{2}$ of the W. 70 acres of the N. E. $\frac{1}{4}$ of section 12, town 5 S., range 3 W., but upon a strip of overrun lying east of and adjoining said description. The case was tried upon the theory that, while the plaintiff had not shown record title to the land upon which the trees stood, he might have acquired title thereto by adverse possession, and had made a sufficient showing to raise a question of fact. The jury returned a verdict against the defendants for the sum of $20, which was trebled by the court, and judgment entered for the plaintiff in the sum of $60 and costs. The defendants bring the case here by writ of error.

It is the contention of the defendants that plaintiff not only did not have title to the land, upon which the trees were situate, by deed, but that he failed to make *prima facie* case of title by adverse possession, and was not entitled to go to the jury upon that theory.

Counsel say, we quote from the brief:

"In the case of *Yelverton* v. *Steele,* reported in 40 Mich. at page 538, the court holds that:

" 'The legal conception of that adverse possession which is required to constitute a bar to the assertion of a legal title by the owner of it, or by one against whom the adverse occupant brings ejectment, is expressed with singular completeness and accuracy by Mr. Justice Duncan, when he says that it must be "an actual, continued, visible, notorious, distinct, and hostile possession." '

"We apprehend that this clear and concise statement of the requisites of proof applies to the adverse occupant or claimant who seeks to mulct in damages those who go upon the land claimed. See *Dummer* v. *Gypsum Co.,* 153 Mich. 622 [117 N. W. 317]. The

cases above named have been repeatedly cited and approved in this State and unquestionably define with certainty and clearness the conditions precedent to an establishment of title by adverse possession.   *   *   *

"These defendants and appellants now most respectfully submit to this honorable court that the plaintiff herein has utterly failed in his attempt to make a *prima facie* case of title by adverse possession, and that his showing falls far short of that clear and cogent proof of the prescribed elements necessary to entitle him to have his claim submitted to a jury as a question of fact. They further submit that the trial judge erred in refusing their request to direct a verdict, and further erred in his refusal to grant a new trial for the reasons and upon the showing set up in their motion therefor."

We cannot agree with counsel in his claim. The land in controversy was a wood lot. The record shows that the northeast quarter of section 12 was a fractional quarter, and was owned prior to 1870 by Jacob K. Camburn. Mr. Conklin testified that Mr. Camburn divided the land between his two sons according to value, giving one the west 70 acres, and the other the east 90 acres. In December, 1870, the county surveyor was employed to establish a boundary line between the two parcels. Some of his testimony is as follows:

"*Q.* Now, I call your attention to the center line running north and south and ask you if you surveyed that line at that time?

"*A.* I did not. I think we didn't pay any attention to that. The idea was to lay off 90 acres and 70 acres. We found a surplus, and that surplus, east and west, was, by direction of somebody, equally divided between the west part and the east part, between the 90 and the 70; that is, after laying off 90 rods from the east line, we added a half of the surplus, and we put the monument at those points, and then ran from one point to the other. We did that both on the north side of the quarter and on the south side of the quarter, and planted the monuments at the two ends of

the line. My notes show that witness tree I had at the north end."

It also appears by his testimony and that of others that stakes were set at intervals on the line between the two monuments.

On October 7, 1867, Jacob K. Camburn, who then owned both the 70 acres and the 90 acres, deeded the north half of the 70 acres to his son Fayette E. Camburn. Fayette E. Camburn died soon after the survey was made, and his son Wade Camburn inherited the land which had been deeded to him. Wade Camburn had frequent talks with his grandfather, and was told by him that the Marks survey made in 1870 was the boundary line between the 70 acres and the 90 acres. Mr. Wade Camburn testified that he always regarded that line as his east boundary line. There is testimony to the effect that there were trees cut on this woodland from time to time by the respective owners, and that the owners of the 90 acres were careful not to get west of this line, and the owners of the 70 acres were careful not to get east of the line. In December, 1872, Wade B. Camburn, as sole heir of Fayette E. Camburn, deeded the land he inherited from his father to the plaintiff in this action. He described the land in the deed as—

"The north half of the west seventy acres of the northeast quarter of section number twelve, town five south, of range three west, containing thirty-five acres of land, more or less. Together with all and singular the hereditaments and appurtenances thereunto belonging or in any wise appertaining with the appurtenances, unto the said party of the second part and to his heirs and assigns forever."

He testified in part:

"Q. Did he (the grandfather) tell you where it was located, or show it to you?

"A. I never went with him to locate the boundary line.

"*Q.* You merely learned from him that there had been a line run through there for a boundary line?

"*A.* Yes, sir; the boundary line was mentioned between us at time of transfer. My grandfather had described this survey to me. He had described this survey that had taken place a long time before, and stated that there had been, I believe, proper stakes set, and that this survey in question marked my eastern boundary of this timber, which is described as the north 35 acres of the west 70 acres, and in conversation with Mr. Butcher this line was talked over in the presence of Mr. Lowry. * * * I intended to sell Mr. Butcher the land that I held, the land mentioned in the deed. I was not able to point out just where this boundary line was; but I expected it to be a survey which my grandfather had told me. I told Mr. Butcher my grandfather had told me that was my line. The land was all wood lot. The only timber taken from it was for fuel and perhaps for rails in fencing the property in Moscow township, and it was the older trees that were cut down. It was not inclosed by any fence on either side. My aunt, Lucinda Camburn, owned the wood lot on the east side of this land.

"*Q.* Now, I ask you whether or not you occupied that for that purpose and used it for that purpose covering all of the land up to the line that your grandfather told you about?

"*A.* Yes, sir.

"*Q.* Now, I want to ask you whether you put Mr. Butcher in possession of all the land that you had up to that old survey line that your grandfather told you about?

"*A.* Yes, sir; * * * grandfather used to talk about this survey through there, that it marked the line between the timber that was mine and the timber that belonged to my aunt, Lucinda Camburn. Now, that is my position and the understanding that I had in relation to this property that it went as far east as this survey. The two tracts were always referred to as the 70 and the 90 acres. The land west of that old survey that my grandfather told me about was always referred to as the 70, and east of that survey was referred to as the 90."

Cross-examination:

"*By Mr. Hawkins:* I am 42 years of age. This entire tract was wood lot when I was a boy and at the time I sold it; I never saw the survey myself. I did not own any other land on the northeast quarter of section 12; I do not know that any wood was ever taken from the overrun. We took up to a certain line, that is, until there was a stone that was supposed to mark the north end of this survey; that was the only part that I knew about. I think Mr. Butcher knew where the line was.

"Q. Now, you say that you talked about this survey. Why wasn't it mentioned in the deed, do you know?

"A. For the reason that I didn't care to give a description of the property other than that I had. Whatever I had I got from my father, and I felt that I was deeding only what I got from him.

"Q. I understand, Mr. Camburn, that you have no means of knowing that you ever took any timber, wood, or anything else from the strip which is in contention?

"A. I don't remember specifically. I know that we used up to a line that was supposed to be from this stone across to—there was a line that was known as the Bates fence, I believe, and we were particular to take nothing east of that."

When Mr. Wells M. Spencer became interested in the land, Mr. Mark, who made the survey in 1870, was employed by Mr. Spencer, by the plaintiff, and by Mr. Bater, who owned the south portion of the 70 acres, to make a survey between the 90 acres and the 70 acres so-called. Mr. Mark found his survey of 1870 and re-established the line there, and it is the claim of the plaintiff that Mr. Spencer expressed himself as satisfied. Several witnesses gave testimony to this effect.

The following appears in the record:

"JONESVILLE, MICHIGAN, May 17, 1911.
"MR. JOHN BUTCHER,
          "Jonesville, Michigan.
"*Friend John:*
"We are now building fence around the timber lot,

and I would like to ask you which end of the fence you prefer to maintain. We expect to turn in some time within the next two weeks. If you wish to put up the same kind of fence as I do, I will furnish it at about wholesale price. Kindly let me know at once of your choice and oblige.

"Yours very truly,
"WELLS M. SPENCER."

We do not pretend to quote all the evidence, and it is the claim of the defendants that the effect of what we have quoted was greatly modified by the cross-examination. We have quoted sufficiently to show that there were questions for the jury. The disputed strip was part of a wood lot, and it is the claim of the plaintiff, and he produced evidence tending to support that claim, that from the time of the survey in 1870 it had been regarded as part of the land now owned by the plaintiff, and that he and his grantors had occupied it in connection with the farm as wood lots are ordinarily occupied. See *Whitaker* v. *Shooting Club,* 102 Mich. 454 (60 N. W. 983); *Chabert* v. *Russell,* 109 Mich. 571 (67 N. W. 902); *Henry* v. *Henry,* 122 Mich. 6 (80 N. W. 800); *White* v. *Peabody,* 106 Mich. 144 (64 N. W. 41); *F. H. Wolf Brick Co.* v. *Lonyo,* 132 Mich. 162 (93 N. W. 251, 102 Am. St. Rep. 412); *Husted* v. *Willoughby,* 117 Mich. 56 (75 N. W. 279).

We think there was a question for the jury, and that the case was fairly submitted.

Judgment is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.